A11A1006, A11A1007. HAWKINS et al. v. DeKALB MEDICAL
CENTER, INC. et al.; and vice versa.

(721 SE2d 131)

PHIPPS, Presiding Judge.

Tara Hawkins sustained head trauma and was taken by ambulance to the emergency room at DeKalb Medical Center. She was 18 years old, unconscious, intubated, and pregnant. During several months of hospitalization there, Tara Hawkins never regained consciousness and was maintained with life-sustaining treatment, including the support of mechanical ventilation. Eventually, physicians at the hospital advised her mother, Nonnie Hawkins, of their concern that Tara Hawkins had likely suffered brain death; even if Tara Hawkins had, they advised Nonnie Hawkins, medical intervention could possibly preserve the life of the fetus until viability. After the baby was born, testing conducted upon Tara Hawkins confirmed for several treating physicians that she was brain dead. Tara Hawkins was thus pronounced dead; the mechanical ventilation was terminated, and all other life-sustaining treatment was ended. Nonnie Hawkins would later depose, "I never believed she was brain dead" and that "[t]hey just killed my child and told me she was dead."

This lawsuit was filed by Nonnie Hawkins, as representative of E. H., a minor and sole survivor and child of Tara Hawkins, decedent; and as administrator of the estate of Tara Hawkins. Nonnie Hawkins (hereinafter "Hawkins") set forth both tort and contract causes of action against numerous health care providers, which claims were premised upon the defendants' conduct during the process that culminated in the termination of mechanical ventilation and all other life-sustaining measures. Pertinent to these appeals are rulings on summary judgment motions. In Case No. A11A1006, we affirm the trial court's grant of partial summary judgment in favor of several defendants (with respect to certain damages); in Case No. A11A1007, we reverse the trial court's denial of summary judgment motions filed by several defendants on the ground that Hawkins had failed to adduce evidence giving rise to a triable issue (with respect to all claims against them).

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[1] "In our de novo review of the grant [or denial] of a motion for summary judgment, we must view the evidence, and all

---

[1] OCGA § 9-11-56 (c).

reasonable inferences drawn therefrom, in the light most favorable to the nonmovant."[2]

### The Evidence

Thus viewed in the light most favorable to Hawkins, the record shows the following. Tara Hawkins was transported to DeKalb Medical Center on November 22, 2003. Because she was unconscious, her mother signed, as her representative, an "Admission Consent Form." It included in the "Consent to Routine Procedures & Treatments" section:

> During the course of my care and treatment, I understand that various types of tests, diagnostic or treatment procedures ("Procedures") may be necessary. These Procedures may be performed by physicians, nurses, technicians, physician assistants or other healthcare professionals ("Healthcare Professionals"). . . . The Procedures may include, but are not limited to the following: . . . Physical tests, assessments and treatments such as vital signs . . . and other similar procedures. . . . I consent to Health Professionals performing Procedures as they may deem reasonably necessary or desirable in the exercise of their professional judgment, including those Procedures that may be unforeseen or not known to be needed at the time this consent is obtained.

Tara Hawkins's initial physicians were emergency medicine doctor Sean Sue, M.D. and pulmonologist Mark Pollock, M.D. She was soon diagnosed as being in a dense coma. And because Tara Hawkins was experiencing seizures, Dr. Pollock requested a consultation with a neurologist, Marshall Nash, M.D.

On November 23, an electroencephalogram (EEG) was performed, the results of which Dr. Nash interpreted as consistent with a global anoxic brain injury; the neurologist believed at that point that brain death in Tara Hawkins was "probably inevitable." On November 24, in an effort to stop Tara Hawkins's ongoing seizures, Dr. Nash recommended to Hawkins that the fetus be aborted to allow for more oxygen consumption by Tara Hawkins's brain cells. Hawkins rejected the recommendation.

---

[2] *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010) (citation and punctuation omitted); *Norton v. Budget Rent A Car System*, 307 Ga. App. 501 (705 SE2d 305) (2010) (we review the denial of summary judgment de novo, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party).

Meanwhile, radiological studies indicated that Tara Hawkins's clinical status had deteriorated since the initial CT scan. A CT scan taken on November 25 showed "a subarachnoid hemorrhage, which [was] consistent with trauma, cerebral edema presumably secondary to the hemorrhage." By that date, Dr. Nash had reached the opinion that brain death in Tara Hawkins was "present or imminent," which he expressed to Hawkins. On November 26, Dr. Nash met with an obstetrician specializing in high-risk pregnancies, who informed him of her opinion that the then-12-week fetus could be maintained through the point of viability. As the obstetrician requested, on about November 29, another EEG was performed on Tara Hawkins; Nash interpreted it on December 1 as demonstrating electrocerebral silence. Within days, Hawkins fired both Dr. Nash and the pulmonologist with whom he had consulted, Dr. Pollock.

Added to Tara Hawkins's medical team the first week of December were neurologist Albert Cook, M.D. and pulmonologists Harold Jackson, M.D. and David Snyder, M.D. During the next three-and-a-half months, Tara Hawkins was subjected to extensive neurological testing by numerous physicians to evaluate whether there was any brain function or brain stem function. According to Dr. Cook, the last part of a brain death evaluation was the performance of an apnea test, which, he described, "involves preoxygenation of the patient and then adjustment of the ventilator, and then observation of monitors and measurement of blood gases." This remaining test (to confirm or dispel brain death) could not be performed, however, because of its potential harm to the fetus. According to Dr. Cook, patients who "fail" the final apnea test are declared dead.

On March 16, 2004, E. H. was born. No longer posing any threat to the baby's life, more thorough examination of Tara Hawkins could then be performed to assess her clinical status. Dr. Jackson discussed with Hawkins that brain death testing (including apnea testing) would be conducted. That day, March 16, Dr. Cook performed the first of two final neurologic evaluations of Tara Hawkins, which revealed no evidence of any brain activity. That same day, the first of two apnea tests was performed by Dr. Jackson, who deposed that the apnea test did not inflict any harm or injury to Tara Hawkins. Dr. Jackson determined that Tara Hawkins "failed," having demonstrated no spontaneous respiration. As Dr. Snyder described, during an apnea test, "we take them off the ventilator and put them on blow-by."[3] Dr. Cook determined that the results of the testing were

---

[3] Dr. Jackson described, "[W]e superoxygenated [Tara Hawkins] and then they placed her on oxygen via blow-by which is going through a tube off the ventilator." And Dr. Cook described that, during the apnea test, "[Tara Hawkins] is getting oxygen, she's not getting repetitive positive pressure."

consistent with brain death. Mechanical ventilation was reimplemented.

The next day, Dr. Jackson discussed with Hawkins that repeat brain death testing would be conducted and that, in the event "[Tara Hawkins] didn't pass the apnea testing," mechanical ventilation would not be reimplemented. Meanwhile, a final EEG was ordered and interpreted by Dr. Cook; it demonstrated "electrocerebral silence, absence of brain wave activity." On March 18, Dr. Cook performed the second and final neurologic evaluation of Tara Hawkins, which revealed no evidence of any brain activity. Drs. Snyder and Jackson performed the second and final apnea test; they determined that Tara Hawkins "failed," again having demonstrated no spontaneous respiration. Dr. Cook deposed that nothing about the apnea testing affected the condition of the brain stem. Based upon the results of the neurologic assessments and the apnea tests on March 16 and March 18, 2004, Dr. Cook determined that Tara Hawkins did not have any brain function or brain stem function and pronounced her dead on March 18. Drs. Snyder and Jackson agreed and decided not to reimplement ventilatory support.

Drs. Cook, Jackson, and Snyder each deposed that, in his professional judgment, the brain death testing and apnea testing conducted on March 16 and March 18 were reasonably necessary under the circumstances to assess the clinical status of Tara Hawkins. Dr. Jackson further deposed that it would have been outside the standard of care *not* to perform the brain death testing. Moreover, the hospital had a written policy on brain-based determination of death, and Dr. Cook testified that the brain death determination was conducted in accordance therewith.

On March 19, 2004, the county's chief medical examiner performed an autopsy on Tara Hawkins's body. That pathologist noted that the "brain fragmented as attempts were made to remove it" and described a "markedly edematous and near liquified brain" with "severe global encephalomalacia." He opined that Tara Hawkins had suffered from, inter alia, "[i]schemic/hypoxic/encephalopathy deteriorating to brain death." Having also reviewed Tara Hawkins's medical records, he further opined that on November 22, 2003, Tara Hawkins suffered significant injury to one or both of her vertebral arteries, causing a significant reduction in blood flow to her brain stem that resulted in respiratory and cardiac arrest for a significant period of time. Additionally, the pathologist opined, "To a reasonable degree of medical probability, [Tara] Hawkins had been brain dead for many months prior to her autopsy on March 19, 2004."

As part of the autopsy, an associate medical examiner for the county examined Tara Hawkins's brain and spinal cord. According to that pathologist, who had expertise in neuropathology and forensic

pathology, "Microscopic examination of the brain revealed global ischemic necrosis with a 'mummified' appearance. In addition, the spinal cord demonstrated extensive liquification." He opined also that, to a reasonable degree of medical probability, Tara Hawkins had been brain dead for many months prior to her autopsy.

## Defendants and Theories of Recovery

In May 2006, Hawkins filed suit. Originally, the complaint named three defendants: (i) Dr. Nash (the neurologist, whom she discharged from her daughter's medical team in December 2003), alleging that he had committed medical malpractice by failing to properly diagnose and treat vascular injuries in Tara Hawkins's neck, thereby causing harm to both Tara Hawkins and to her unborn child; (ii) DeKalb Neurology Associates, LLC, alleging liability based upon a theory of respondeat superior for Nash's acts and omissions; and (iii) DeKalb Medical Center, Inc. (DMC), setting forth a count of "tortious termination of life support." Hawkins alleged that she had "objected to the termination of Tara's life support for months against the adamant and erroneous opinions that Tara was 'brain dead,'" and that "Tara died when DeKalb Medical Center terminated life support for Tara without the informed consent of Nonnie Hawkins or any member of Tara's family and without any authorization or order from a court of law."

Notably, early in the litigation, DMC filed a motion to dismiss this claim, arguing that Hawkins had failed to timely file the action and had failed to comply with the expert affidavit requirements of OCGA § 9-11-9.1.[4] In the first appearance of this case before this court, *DeKalb Med. Center v. Hawkins*,[5] we affirmed the trial court's denial of DMC's motion, having determined that Hawkins's "claim was not a medical malpractice action requiring an expert medical affidavit under OCGA § 9-11-9.1"[6] and that the claim was not time barred.[7]

Thereafter, Hawkins amended her complaint. In 2008, she added as medical malpractice defendants: (i) Dr. Sue (the emergency medicine physician); and (ii) Dr. Pollock (the pulmonologist whom she discharged from her daughter's medical team in December 2003). Hawkins alleged that they had committed medical malpractice by failing to properly diagnose and treat vascular injuries in Tara Hawkins's neck, causing harm to both her and to her unborn child.

---

[4] *DeKalb Med. Center v. Hawkins*, 288 Ga. App. 840, 843 (1) (655 SE2d 823) (2007).

[5] Supra.

[6] Id. at 844 (1).

[7] Id. at 844-848 (2).

She also added as a defendant Pulmonary & Sleep Specialists, P.C., under a theory of respondeat superior for Dr. Pollock's acts and omissions.

In 2009, Hawkins filed a second amended complaint, adding as two defendants: Drs. Jackson and Snyder, alleging that these two pulmonologists were liable also for wrongful death by "[t]ortious [t]ermination of [l]ife [s]upport." In this pleading, Hawkins alleged that although she had "adamantly objected to the termination of Tara's life support," defendants DMC, Dr. Jackson, and Dr. Snyder "terminated Tara Hawkins's life support without Court Order and without the informed consent of Nonnie Hawkins or any member of Tara's family." Hawkins also added as a defendant Southeastern Lung Care, P.C., alleging that under a theory of respondeat superior, the entity was liable for the acts and omissions of Drs. Jackson and Snyder.

Also in her second amended complaint, Hawkins included two new theories of recovery against DMC. In one of the newly added counts, Hawkins alleged breach of contract, citing language in the Admission Consent Form that she signed the day her daughter was admitted to the hospital. Specifically, in the "Advance Directives" section, the form stated: "I acknowledge and understand my rights, as an adult patient, to make decisions regarding treatment, *including the right to consent to, refuse or alter treatment*, and to formulate advance directives which will govern should I become incapacitated."[8] Hawkins alleged, "Defendant DeKalb Medical Center's discontinuation of mechanical ventilation, withdrawal of care, and termination of life support for Tara Hawkins [constituted] a breach of the parties' contract."

In the second newly added count against DMC, Hawkins claimed that it was vicariously liable for the alleged medical malpractice committed by Dr. Sue (the emergency medicine doctor). In the lawsuit, Hawkins sought numerous types of damages, as well as costs of litigation.

### Summary Judgment Motions and Trial Court's Rulings

Wrongful death defendants DMC, Dr. Jackson, Dr. Snyder, and Southeastern Lung Care sought summary judgment on the respective claims against them for tortious termination of life support and breach of contract. They argued that they had acted appropriately in connection with terminating mechanical ventilation for Tara Hawkins. They cited Georgia's Determination of Death Act, OCGA § 31-10-16, which not only sets forth criteria for determining death,

---

[8] (Emphasis supplied.) Hawkins's claim is premised primarily on the italicized language.

but provides also for immunity in specified circumstances. Hawkins countered that her daughter was not brain dead on March 18, 2004 (prior to the final apnea test) and that discontinuation of her child's life support required either her consent or judicial approval, of which the defendants had neither. In July 2010, the trial court denied the defendants' summary judgment motions.

The following month, the trial court granted a summary judgment motion that was jointly filed by those defendants charged with medical malpractice (Drs. Sue, Nash, and Pollock, as well as entities DMC, DeKalb Neurology Associates, and Pulmonary & Sleep Specialists) on Hawkins's claims for past and future lost wages of Tara Hawkins and for loss of earning capacity of Tara Hawkins.

After entry of a consolidated pretrial order, Hawkins filed in August 2010 a notice of appeal,[9] contesting (inter alia) the grant of summary judgment against her with respect to damages.[10] Thereupon, a joint notice of cross-appeal was filed by DMC, Dr. Jackson, Dr. Snyder, and Southeastern Lung Care, contesting the denials of their summary judgment motions.[11]

In this opinion, we address first the cross-appeal, Case No. A11A1007, as holdings therein either resolve or render moot many of the contentions raised in Case No. A11A1006.

### Case No. A11A1007

Wrongful death defendants DMC, Dr. Jackson, Dr. Snyder, and Southeastern Lung Care contend that the trial court erred in denying their motions for summary judgment on Hawkins's respective claims against them. They cite OCGA § 31-10-16:

> (a) A person may be pronounced dead by a qualified physician . . . if it is determined that the individual has sustained . . . (2) irreversible cessation of all functions of the entire brain, including the brain stem.
>
> (b) A person who acts in good faith in accordance with the provisions of subsection (a) of this Code section shall not be liable for damages in any civil action. . . .

---

[9] Hawkins states in a brief, filed February 24, 2011, that the "trial court declined to send the entire case before this [c]ourt for review," that trial proceeded against the medical malpractice defendants, and that the jury returned verdicts in favor of those defendants.

[10] See Division 3, infra. See also OCGA § 9-11-56 (h) ("An order granting summary judgment on any issue or as to any party shall be subject to review by appeal.").

[11] See OCGA §§ 5-6-38 (a) (allowing for cross-appeals); 5-6-44 (a) (allowing for joint appeals); *Southeast Ceramics v. Klem*, 246 Ga. 294-295 (1) (271 SE2d 199) (1980) (denial of motion for summary judgment may be carried up as a cross-appeal to the appeal of the grant of a motion for summary judgment).

(c) The criteria for determining death authorized in subsection (a) of this Code section shall be cumulative to and shall not prohibit the use of other medically recognized criteria for determining death.

These defendants maintain that, prior to the apnea testing on March 18, Tara Hawkins suffered irreversible cessation of all functions of the entire brain, including the brain stem, and therefore was brain dead;[12] that she was thus pronounced dead in good faith; that they acted appropriately in not reimplementing mechanical ventilation; and therefore, they cannot be held liable for damages in this suit. Drs. Jackson and Snyder add, "Nothing can be more basic to a physician's assessment of a patient than determining if the patient is alive or dead," and "[t]here is no duty in Georgia for a physician to continue to treat a dead patient."

The trial court denied their motions for summary judgment because it determined that there were factual disputes to be resolved by a jury concerning: (a) "whether Tara Hawkins was brain dead as of March 18, 2004"; (b) whether these defendants had acted in good faith pursuant to OCGA § 31-10-16 (b) "when they terminated the life support for Tara Hawkins on March 18, 2004"; and (c) whether the defendant DMC had "Hawkins' consent to disconnect life support." For reasons that follow, we agree with the defendants that the evidence created "no genuine issue as to any material fact"[13] on the claims against them, and that therefore, their motions for summary judgment should have been granted.

1. We turn first to these defendants' motions on Hawkins's theory of recovery against them for wrongful death by tortious termination of life support. In opposing the motions, Hawkins maintained before the trial court that she "was falsely informed by the [d]efendants that Tara was brain dead when she was not brain dead" and that the defendants "DeKalb Medical Center and Drs. Jackson and Snyder killed her by turning off her ventilator on March 18, 2004."

While Hawkins thus claimed that it was the termination of mechanical ventilation support that caused her daughter's death, these defendants argued that it was Tara Hawkins's brain death that led to the termination of that (as well as all other life-sustaining) support. Resolution of this issue (which resulted from the other), in

---

[12] See *Clay v. State*, 256 Ga. 797 (4) (353 SE2d 517) (1987) (holding that evidence was sufficient to sustain malice murder conviction, where blows administered by defendant resulted in irreversible cessation of all functions of the brain and brain stem and victim continued to breathe and his heart continued to beat only because of a life support system) (citing OCGA § 31-10-16 (a)).

[13] OCGA § 9-11-56 (c).

accordance with *Cowart v. Widener*,[14] required expert evidence. And Hawkins's failure to adduce such evidence on this issue doomed her claims that the defendants were liable for wrongful death by tortious termination of life support.

(a) In *Cowart*, the Supreme Court of Georgia drew a distinction between issues that would require expert evidence and those that would not. On the one hand, the Court explained, "[w]here the causal link between the defendant's conduct and the decedent's injury can be determined by a lay jury without expert guidance, no expert evidence need be produced to defeat a defense motion for summary judgment."[15] As an example, the Court provided:

> [I]n a wrongful death action based on the theory that the defendant proximately caused the decedent's death by stabbing her in the gut, the plaintiff is not required, in response to a motion for summary judgment, to come forward with expert testimony explaining in medical terms precisely how the wound led to her death.[16]

On the other hand, the Court continued, "sometimes the link between a defendant's actions and the plaintiff's injury is beyond common knowledge and experience."[17]

> Thus, in deciding whether the plaintiff is required to come forward with expert testimony to withstand a defense motion for summary judgment, the critical question is not whether the causation element involves a "medical question" in the generic sense of the term. Rather, it is whether, in order to decide that the defendant's conduct proximately caused the plaintiff's injury, a lay jury would have to know the answers to one or more "medical questions" that, as the case law has defined that term, can be answered accurately only by witnesses with specialized expert knowledge. To

---

[14] Supra. Although *Cowart* was a negligence case, and this is not, the instructions therein are applicable here.

[15] Id. at 628 (2) (b) (citations omitted).

[16] Id. As additional examples, the Court cited *Jester v. State*, 250 Ga. 119-120 (296 SE2d 555) (1982) ("[T]hat a stab wound penetrating entirely through the heart causes death, is not a matter . . . which should even require expert testimony."), *Allstate Ins. Co. v. Sutton*, 290 Ga. App. 154, 160 (3) (658 SE2d 909) (2008) ("[W]hether a blow to the head could cause death [is] a question that we have held to be within a lay person's knowledge"), and *Jordan v. Smoot*, 191 Ga. App. 74-75 (1) (380 SE2d 714) (1989) (holding that whether an automobile collision caused a backache later the same day is not the type of medical question that requires expert testimony).

[17] *Cowart*, supra.

make the term more clearly reflect its use in deciding cases, we will now refer to "specialized medical questions."[18]

Given the circumstances underlying this case, whether Tara Hawkins was brain dead prior to apnea testing on March 18, 2004 constituted a specialized medical question to be answered by medical experts.[19] In moving for summary judgment, DMC, Dr. Jackson, Dr. Snyder, and Southeastern Lung Care relied upon the medical testimony of Tara Hawkins's treating physicians, as well as the physicians who conducted the autopsy. Each physician testified that Tara Hawkins had suffered brain death prior to the apnea testing on March 18.

Consequently, it was incumbent on Hawkins to come forward with expert evidence to give rise to a triable issue on the specialized medical question.[20] She did not do so; instead, she relied on lay witnesses' accounts that Tara Hawkins was crying, "overbreathing the ventilator," and moving her hand in response to pleas. Also, Hawkins pointed to the birth of E. H.

*Tara Hawkins was observed "crying."* Hawkins's friend of 20 years deposed that, while alone with Tara Hawkins, "I was reading to Tara and talking to Tara and having a general conversation with Tara about some stuff that was going on with me and tears started to slip out of her eyes like she heard me." The friend noted, however, that the incident occurred near the "end [of] January, before Valentine's Day." This lay witness's account fell short of creating a genuine issue of material fact as to whether, prior to the apnea test on March 18, Tara Hawkins had suffered brain death.

*Tara Hawkins was observed "moving her hand on command."* Hawkins's longtime friend recalled that she was with Hawkins, who had assembled family and friends in Tara Hawkins's hospital room on March 18, because that was the "last day they were going to do this last test, make their assessment and decide whether to keep Tara on the ventilator or life support. . . . And while we were talking

---

[18] Id. at 629 (2) (b). As examples, the Court cited *Gilbert v. R. J. Taylor Mem. Hosp.*, 265 Ga. 580, 581 & n. 4 (458 SE2d 341) (1995) (whether plaintiff actually had cancer that required treatment), and *Allstate Ins. Co.*, supra at 160 (whether exposure to mold caused plaintiff's respiratory ailments).

[19] See OCGA § 31-10-16 (authorizing "a qualified physician" to pronounce death if it is determined that individual has sustained "irreversible cessation of all functions of the entire brain, including the brain stem"); see generally *In re Bowman*, 617 P2d 731 (Wash. 1980) (holding that it is for the medical profession to determine the applicable criteria for deciding whether brain death is present and to define the acceptable practices taking into account new knowledge of brain function and new diagnostic procedures).

[20] See generally *Cowart*, supra at 627 (2) (a) (even in simple negligence cases, plaintiffs must come forward with expert evidence to survive a defense motion for summary judgment, where medical questions relating to causation are involved).

about it and we were praying over Tara, she moved her finger, thumb or index." Hawkins then pleaded with her daughter to wake up, open her eyes, or somehow show that "you're really here"; Tara Hawkins's hand moved; "[Hawkins] got really excited and went out in the hall and called some doctors in to see that Tara was really moving."

The obstetrician deposed that, on March 18, Hawkins reported that Tara Hawkins had been exhibiting twitching in her hand. She recalled that Hawkins expressed her belief that the twitching was significant. The physician deposed, however, that she had never seen Tara Hawkins's hand move on any prior occasions and that any hand movement on March 18 was of no clinical significance.

A nurse deposed that, on March 18, "[Tara Hawkins] did have some twitching of her right thumb at one point." However, she testified, "I could not witness to the fact that I thought it was anything other than random. It did not appear to be on demand. . . . I won't say it was in response to Hawkins." Further, the nurse recalled, several physicians came to Tara Hawkins's bedside, and Dr. Cook performed a thorough neurological examination and found no indication of any brain function.

Dr. Cook deposed that, under the circumstances, the hand movement was no indication of any independent brain stem function, but was a manifestation of a working peripheral nervous system. The neurologist explained, "There are other parts of the nervous system . . . [that] can still work with a — in the absence of a brain. . . . Those are the sorts of things we were seeing here." He added, "[O]bviously we have the benefit of hindsight here where we know the medical examiner's finding, and a brain that is as described by the medical examiner can't do this."

*Tara Hawkins was observed "overbreathing the ventilator."* Hawkins deposed that periodically, including on March 18, her daughter was "overbreathing the ventilator." By that, she was referring to her observation of discrepancies between the ventilator's setting and the number of patient breaths (per minutes) being registered by the machine.

When asked hypothetically about a discrepancy, Dr. Cook answered that he could not "explain everything that those machines do. I'm not that familiar with the mechanical features of ventilators to know how much of a discrepancy is a discrepancy of significance, nor how much can be induced by external factors." In addition, he explained that a discrepancy would not necessarily mean that there is brain stem function; and in this case, appropriate brain death testing was conducted and revealed no evidence of any brain function or brain stem function.

*E. H. was born.* Hawkins pointed to the birth of E. H., as well as

a notation on Tara Hawkins's autopsy report of "[l]actating breasts." But Dr. Cook deposed that E. H.'s birth had not affected his determination of brain death and that the circumstances of the baby's birth did not indicate any brain function. And despite the cited autopsy notation, both pathologists involved in conducting the autopsy nevertheless concluded that Tara Hawkins had been brain dead for many months prior to the March 19 autopsy.

A determination of whether the observations of lay witnesses, individually or collectively, showed that Tara Hawkins was not brain dead before the final apnea testing and termination of ventilatory support on March 18 required expert evidence. Without such, a conclusion that Tara Hawkins was not brain dead would be one based on pure speculation or conjecture. "Summary judgment cannot be avoided based on speculation or conjecture; once the pleadings are pierced with actual evidence, the plaintiff must point to admissible evidence showing a genuine issue of fact."[21] Confronted with the defendants' expert evidence that Tara Hawkins was brain dead before the final apnea testing occurred, Hawkins failed to adduce any such evidence to the contrary, leaving the record on this issue undisputed.

> [T]o prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact, so that the party is entitled to judgment as a matter of law. A defendant may do this by either presenting evidence negating an essential element of the plaintiff's claims or establishing from the record an absence of evidence to support such claims. . . . Where a defendant moving for summary judgment discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue.[22]

Because the uncontroverted expert evidence thus established that Tara Hawkins was brain dead before the final apnea test was conducted, Hawkins cannot show that the termination of mechanical ventilation caused her daughter's death.[23] Where, as here, "there is

---

[21] Id. at 633 (3) (c) (citation omitted); see *Shadburn v. Whitlow*, 243 Ga. App. 555, 556 (533 SE2d 765) (2000) (an inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility).

[22] *Cowart*, supra at 623 (1) (a) (citations and punctuation omitted); see *Howard v. Walker*, 242 Ga. 406, 408 (249 SE2d 45) (1978) (where plaintiff must produce an expert's opinion in order to prevail at trial, when the defendant produces an expert's opinion in his favor on motion for summary judgment and the plaintiff fails to produce a contrary expert opinion in opposition to that motion, there is no genuine issue to be tried by the jury).

[23] See generally *Cowart*, supra at 631 (3) (a) (if event would have occurred irrespective of

no evidence sufficient to create a genuine issue as to any essential element of [a] plaintiff's claim, that claim tumbles like a house of cards."[24] For this reason, we conclude that DMC, Dr. Jackson, Dr. Snyder, and Southeastern Lung Care were entitled to summary judgment on Hawkins's claims of wrongful death by tortious termination of life support.[25]

(b) Consequently, with respect to these tort claims, we need not consider whether these defendants were entitled (also) to immunity under OCGA § 31-10-16.[26] And contrary to the trial court's determination, a jury need not decide whether these defendants acted in good faith pursuant to OCGA § 31-10-16 so as to entitle them to that statute's immunity.[27]

(c) Hawkins maintains that the evidence was in dispute regarding whether she consented to the termination of life support.

For reasons set forth above, there is no evidence that Tara Hawkins's death was *caused* by any lack of consent. Therefore, even accepting, arguendo, that a factual dispute exists as to whether Hawkins consented to either the brain death testing or to the termination of mechanical ventilation,[28] such an evidentiary conflict affords no escape from summary judgment on the wrongful death claims. "A plaintiff cannot avoid summary judgment by pointing to contradictory evidence in the record on an issue that makes no difference to the legal analysis."[29]

---

defendant's conduct, such conduct is not cause of event); *Bauer v. North Fulton Med. Center*, 241 Ga. App. 568, 569 (1) (527 SE2d 240) (1999) ("it is an impossibility to kill or injure someone who is already deceased").

[24] *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

[25] See *Cowart*, supra; *Howard*, supra; *Allstate Ins. Co.*, supra; *Mobley v. Nabisco, Inc.*, 264 Ga. App. 352 (590 SE2d 741) (2003) (summary judgment was properly granted to defendant on wrongful death claim because plaintiff presented no evidence that victim was still alive at the time of defendant's complained-of act); see generally *In re Bowman*, supra.

[26] *Lau's Corp.*, supra (if there is no evidence sufficient to create a genuine issue as to any essential element of plaintiff's claim, that claim is subject to summary judgment, and "[a]ll of the other disputes of fact are rendered immaterial"); see *Gallups v. Cotter*, 534 S2d 585 (Ala. 1988) (where child had been diagnosed as brain dead and pronounced dead, and minor patient's father alleged in lawsuit that defendant doctors had committed against him the "tort of outrage" by removing the life support systems from his child's body contrary to the family's expressed wishes, summary judgment was properly granted to defendants because father failed to present evidence of an essential element of the alleged tort; therefore, the question whether the father's outrage claim was barred by immunity under state's brain death statute was not reached).

[27] See *Lau's Corp.*, supra.

[28] Defendants maintain that there is no evidence showing that Hawkins objected to brain-death testing.

[29] *Deen v. Stevens*, 287 Ga. 597, 612 (3) (b) (698 SE2d 321) (2010) (citation omitted); see *Lau's Corp.*, supra; *Berry v. Hamilton*, 246 Ga. App. 608, 610 (541 SE2d 428) (2000) (when a party is relying on inferences to prove a point, not only must those inferences tend in some proximate degree to establish the conclusion sought, but they must also render less probable all inconsistent conclusions).

Nothing in the cases of *In re Jane Doe*,[30] *In re L. H. R.*,[31] *Velez v. Bethune*,[32] cited by Hawkins, supports her argument that termination of life support required her consent or a court order. There is a crucial distinction between those cases and the instant one. In those cases, the evidence had not undisputedly established that the patient was brain dead prior to the termination of mechanical ventilation or other life-sustaining measures.[33] Because those cases are inapposite, Hawkins's reliance upon them is misplaced.

Hawkins also cites language within our prior decision in this case, *DeKalb Med. Center*,[34] that the issue in this case is "whether [DMC] committed an intentional tort when it deliberately terminated [Tara Hawkins's] life support *without the consent of the decedent, her family, or the court, and over the objections of the decedent's mother*."[35] When this case was previously before us, we were considering whether Hawkins's wrongful death claim (at that time filed only against DMC) was barred as either untimely filed or filed unaccompanied by an expert affidavit pursuant to OCGA § 9-11-9.1.[36] At that early stage, the litigation had not yet advanced to the point that Hawkins's claims were under attack by summary judgment motions (for failure to present evidence giving rise to a triable issue).[37] Given the inapposite procedural posture of our prior decision, the language isolated therefrom is unavailing to Hawkins at this appellate juncture.[38]

2. DMC contends that the trial court erred in denying its motion

---

[30] 262 Ga. 389 (418 SE2d 3) (1992).

[31] 253 Ga. 439 (321 SE2d 716) (1984).

[32] 219 Ga. App. 679 (466 SE2d 627) (1995).

[33] See *In re Jane Doe*, supra at 389-391 (evidence showed that hospital patient with degenerative neurological disease varied between being in "stupor and coma," was placed on breathing and feeding tubes, but "was not in a chronic vegetative state and death was not imminent"); *In re L. H. R.*, supra at 439, 446-447 (concerning the right to refuse medical treatment for a patient in a "chronic vegetative state with no hope of development of cognitive function"; concluding that the decision whether to end the *dying process* is one for family members or those who bear a legal responsibility for the patient, while courts remain open to assist with disagreement between decision-makers; not addressing, however, "the question of . . . prior judicial approval in cases in which the issue is *life-prolonging* rather than death-prolonging treatment for incompetent patients") (emphasis supplied); *Velez*, supra at 680 (2) (evidence was in conflict as to whether hospital patient was clinically dead at the time in question).

[34] Supra.

[35] *DeKalb Med. Center*, supra at 844 (emphasis supplied).

[36] Id. at 841.

[37] See *Ogden Equip. Co. v. Talmadge Farms*, 232 Ga. 614, 615 (208 SE2d 459) (1974) (a motion for summary judgment is designed to test the *merits* of the claim).

[38] See generally *May v. Macioce*, 200 Ga. App. 542, 544 (2) (409 SE2d 45) (1991) (appellate court holdings as to pleadings and evidence are not binding as the law of the case, where the evidentiary posture of the case in the trial court changes subsequent to the appellate court decision).

for summary judgment on Hawkins's breach of contract claim.

Hawkins claimed that the brain death testing and the termination of life support were done without her consent, contrary to cited language within the "Advance Directives" section of the Admission Consent Form. And as she explains, "This is a wrongful death case, arising from the tortious, unconsented to, discontinuation of Tara Hawkins' life support by the Appellees. . . . The brain death testing, for which there was no consent, is part of the underlying act that led to Tara Hawkins' wrongful death."

DMC countered that Hawkins consented to the brain death testing, citing language within the "Consent to Routine Procedures & Treatments" section. And DMC disputed that it needed Hawkins's consent to terminate mechanical support after brain death testing revealed that Tara Hawkins was brain dead and she was therefore pronounced dead.

DMC alternatively argued that, irrespective of any consent issue, the breach of contract claim was a mere repackaging of Hawkins's tort claim and thus failed for the same reason: The undisputed expert evidence established that neither the brain death testing nor the termination of life support *caused* Tara Hawkins's death because, prior to both of these events, she already had sustained brain death.[39] On appeal, DMC posits:

> [The] apnea and brain death tests no more CAUSE death to a patient than x-rays CAUSE a bone fracture or MRIs CAUSE a brain tumor. Rather, all of these tests are done to elicit information about a patient that **ALREADY EXISTS WITHIN THE PATIENT BUT IS NOT YET KNOWN TO THE PATIENT'S PHYSICIAN**. For a fracture to show up on an x-ray, the patient's bone must ALREADY be broken; for a tumor to show up on an MRI, the tumor must ALREADY exist. Similarly, for apnea and brain death tests on Tara to demonstrate death, Tara must ALREADY be dead.[40]

Notably, as was decided early in the litigation, Hawkins asserted no medical malpractice claim against DMC with respect to either the brain death testing or the disconnection of life support equipment.[41]

---

[39] See OCGA § 31-10-16 (a).

[40] (Emphasis in original.)

[41] As we noted in the first appearance of this case before us, Hawkins is "not claiming that DMC negligently cared for [Tara] Hawkins prior to terminating her life support or that it negligently performed the actual process of turning off and disconnecting the life support equipment." *DeKalb Med. Center*, supra at 842 (1).

And as we concluded in Division 1,[42] there is no evidence that either the brain death testing or the subsequent termination of ventilatory support caused Tara Hawkins's death; this conclusion remains true, irrespective of whether DMC needed but failed to obtain either Hawkins's consent or a court order.[43] Because any damages sought by Hawkins therefore did not result from the alleged failure to obtain either her consent or a court's order,[44] the trial court erred by not granting summary judgment to DMC on Hawkins's breach of contract claim.[45]

Hawkins persists: " 'Touching' another human being without consent is actionable," relying on cases such as *Prince v. Esposito*[46] that recognize, "An action for battery arises in the medical context when a medical professional makes unauthorized contact with a patient during examination, treatment, or surgery."[47] Plainly, those cases are inapposite and do not provide for an outcome in her favor on DMC's motion for summary judgment on her breach of contract theory.

While an evidentiary dispute may have arisen as to the issue of consent, DMC's motion for summary judgment upon this theory of recovery should have been granted.

## Case No. A11A1006

3. Hawkins contends that the trial court erred in granting the summary judgment motion filed jointly by DMC and the other medical malpractice defendants on her claim for past and future lost wages of Tara Hawkins and for loss of earning capacity of Tara Hawkins.

The trial court granted the motion after having determined that

---

[42] Supra.

[43] See Division 1 (c), supra.

[44] See *Kuritzky v. Emory Univ.*, 294 Ga. App. 370, 371 (1) (669 SE2d 179) (2008) ("The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken.") (citation omitted); see also OCGA § 13-6-2 ("Damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach."); *Bauer*, supra at 572 (3) (b) ("Damages growing out of a breach of contract . . . must be such as could be traced solely to breach, be capable of exact computation, must have arisen according to the usual course of things, and be such as the parties contemplated as a probable result of such breach.").

[45] *Lau's Corp.*, supra (lack of sufficient evidence on any essential element of plaintiff's claim renders all other factual disputes, as to that claim, immaterial).

[46] 278 Ga. App. 310 (628 SE2d 601) (2006). Hawkins cites also *King v. Dodge County Hosp. Auth.*, 274 Ga. App. 44, 45 (616 SE2d 835) (2005) (recognizing that a cause of action for battery exists when objected-to treatment is performed without the consent of, or after withdrawal of consent by, the patient).

[47] *Prince*, supra at 311 (1) (a) (punctuation and footnote omitted).

the medical evidence showed that the traumatic injuries suffered by Tara Hawkins before her arrival at the hospital's emergency room had already rendered her incapable of any future employment, irrespective of any alleged medical malpractice thereafter. On appeal, Hawkins cites no pertinent evidence that the trial court overlooked, asserting instead that she "provided substantial evidence about Tara's interest, talents, and aspirations." This assertion provides no basis for reversing the summary judgment.[48]

4. Hawkins contends that the trial court erred by unilaterally amending the consolidated pretrial order. She asserts, "The trial court's amendments effectively granted partial summary judgment on Appellants' claims for tortious termination of life support. Appellants appeal this erroneous ruling." Pretermitting whether this contention is properly before us, given our holdings in the preceding divisions, which leave Hawkins without any viable claim, challenges to an amended pretrial order are moot.

*Judgment affirmed in Case No. A11A1006. Judgment reversed in Case No. A11A1007. Andrews and McFadden, JJ., concur.*

DECIDED NOVEMBER 18, 2011 —
RECONSIDERATION DENIED DECEMBER 6, 2011 — 

*Pope, McGlamry, Kilpatrick, Morrison & Norwood, M. Gino Brogdon, William Q. Bird, William B. Drummond, James D. Summerville, John W. Crongeyer, Lee T. Wallace*, for appellants.

*Bendin, Sumrall & Ladner, Timothy H. Bendin, Kristin L. Hiscutt, Huff, Powell & Bailey, Daniel J. Huff, Erica S. Jansen*, for appellees.

*Glenn P. Hendrix, Arnall, Golden & Gregory, Jason E. Bring, Allen, McCain & O'Mahony, Hunter S. Allen, Jr., Allen, Weathington & Reeves, Simuel F. Doster, Jr.*, amici curiae.

---

[48] See generally *Zwiren v. Thompson*, 276 Ga. 498, 500 (578 SE2d 862) (2003) (a plaintiff cannot recover for medical malpractice, even where there is evidence of negligence, unless the plaintiff establishes by a preponderance of the evidence that the negligence either proximately caused or contributed to cause the harm).