**June 28, 2019**

# In the Court of Appeals of Georgia

A19A0215. THE FULTON-DEKALB HOSPITAL AUTHORITY et
al. v. HICKSON.

REESE, Judge.

The Fulton-DeKalb Hospital Authority, o/k/a Grady Memorial Hospital Corporation, d/b/a Grady Memorial Hospital; Emory Healthcare, Inc.; and Emory University; Carl Nee-Kofi Mould-Millman, M.D., and Betsy Kinchen, L.C.S.W. (collectively, "Grady") seek review of an order of the State Court of DeKalb County, denying Grady's motion for summary judgment in this medical malpractice action filed by Denise Hickson, as Guardian of Maximillian McClain, an Incapacitated Adult. On appeal, Grady argues that the trial court erred in finding that, as a matter of law, Grady was not immune from liability for actions it took in good faith

compliance with the discharge provisions of Chapter 3 of Georgia's Mental Health Code.[1] For the reasons set forth infra, we affirm.

Construing the evidence in the light most favorable to Hickson, as the nonmovant,[2] the record shows the following facts. In the early morning hours of January 20, 2013, an ambulance brought McClain to Grady Memorial Hospital's Emergency Department ("ED"). McClain had been going door-to-door through his apartment building, "screaming and banging on doors[.]" 911 was called, and McClain became combative with the EMS crew, going so far as to punch a police officer who was helping the crew. McClain also kicked the interior compartment of the ambulance and attempted to break the ambulance equipment.

After EMTs administered Versed, a benzodiazepine, to McClain, he managed to communicate that he was "having a mental break," and that he could not "control" himself. McClain also told the EMTs that he had a history of paranoia and bipolar disorder. McClain arrived at the ED at approximately 3:13 a.m. and was triaged within five minutes.

_____

[1] See OCGA § 37-3-1 et seq.

[2] See *Abdel-Samed v. Dailey*, 294 Ga. 758, 760 (1) (755 SE2d 805) (2014).

The triage nurse assessed that McClain was a suicide risk due to statements he made about hurting himself. At 3:30 a.m., a one-on-one sitter was assigned to observe McClain and document her observations every 15 minutes. At approximately 4:29 a.m., Dr. John H. Lloyd was assigned as McClain's attending ED physician. An initial drug screening was negative for drugs and alcohol.

According to McClain's medical records, McClain reiterated to Dr. Lloyd that he had a history of bipolar disorder and panic attacks, and added that he had become suicidal earlier in the evening and had a plan to end his life. McClain did not articulate his plan, but said that he had aborted it because it would set off a chain reaction of other people killing themselves. Instead of going through with the plan, and even though it was the middle of the night in January, McLain had lain down in the front yard of his apartment complex.

At 6:46 a.m., Dr. Lloyd signed a Form 1013 certificate for Involuntary Mental Health Evaluation ("1013"), secondary to a "[s]uicidal, bipolar/anxiety" diagnosis, A 6:48 a.m. entry on McClain's medical chart confirmed that Dr. Lloyd involuntarily committed McClain for inpatient treatment on Grady's psychiatric floor. At the shift change 12 minutes later (7:00 a.m.), Dr. Lloyd's shift ended, and Dr. Mould-

Millman's shift began. When Dr. Lloyd left, he "did not think that [McClain's] mental status would clear up and that he could be discharged."

Around the same time as the shift change, McClain was administered a dose of Ativan, a benzodiazephine that has sedating effects, that Dr. Lloyd had prescribed. McClain was not transferred to the psychiatric floor; instead Kinchen, a licensed clinical social worker working for Grady, "intercepted" and reassessed him. Kinchen found McClain to be stable and recommended to Dr. Mould-Millman that he be discharged. At 8:01 a.m., Kinchen entered a note on McClain's chart mentioning her plan to consult with Dr. Mould-Millman.

Six minutes later, at 8:07 a.m., Dr. Mould-Millman rescinded the 1013. Dr. Mould-Millman noted on McClain's chart that he had "reassessed" McClain and found that he had no current suicidal or homicidal ideations, that he was calm and cooperative, and that he was able to be safely discharged. There is no evidence that either Kinchen or Dr. Mould-Millman contacted Dr. Lloyd before deciding to discharge McClain. Approximately 11 hours later, McClain attempted to commit suicide by jumping off a third-floor balcony, severing his carotid artery and suffering massive brain injuries.

Hickson, as McClain's guardian, filed suit against Grady and Dr. Lloyd, alleging claims for medical malpractice against the individual defendants and vicarious liability against the other defendants. According to the complaint and supporting affidavits, the individual defendants grossly breached the applicable standard of care by failing to: perform a thorough psychiatric evaluation, thoroughly review McClain's past psychiatric treatment history; consult and/or coordinate care with McClain's treating psychiatrist or, alternatively, more experienced psychologists or psychiatrists; adequately assess McClain's current psychosocial situation; and document a safety plan to prevent the recurrence of suicidal thoughts, plans, or actions.

The trial court entered a consent order dismissing without prejudice Hickson's claims against Dr. Lloyd. Grady moved for summary judgment, arguing that it was entitled to immunity under OCGA § 37-3-4, because it had discharged McClain in good faith and in compliance with the statutory requirements of Chapter 3 of Title 37.

The trial court found that Grady was not entitled to summary judgment in light of several material issues of fact: whether placing a medical note reflecting McClain's discharge constituted good faith compliance with the notice provisions of OCGA §§ 37-3-4 and 37-3-43 (c); whether the assessments of McClain by Kinchen and Dr.

5

Mould-Millman were insufficient and inadequate to the extent that any decision made thereon would not be in good faith; and whether Grady failed to meet the applicable standard of care in providing treatment to McClain, for which it would not be immune under OCGA § 37-3-4.

The trial court entered a certificate of immediate review, and we granted Grady's application for interlocutory appeal. This appeal followed.

> [The appellate court's] review of the grant or denial of summary judgment is de novo, and [the appellate court] view[s] the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant. Summary judgment is warranted only where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law.[3]

"[I]n construing a statute, we look at its terms, giving words their plain and ordinary meaning, and where the plain language of a statute is clear and susceptible of only one reasonable construction, we must construe the statute according to its terms."[4] "[I]n construing language in any one part of a statute, a court should consider

---

[3] *Abdel-Samed*, 294 Ga. at 760 (1).

[4] *Mahalo Investments III v. First Citizens Bank & Trust Co.*, 330 Ga. App. 737, 738 (769 SE2d 154) (2015); see also OCGA § 1-3-1 (construction of statutes generally).

6

the entire scheme of the statute and attempt to gather the legislative intent from the statute as a whole."[5] Statutory construction is a question of law, which we review de novo.[6]

With these guiding principles in mind, we turn now to Grady's claims of error.

1. Grady argues that the trial court erred in concluding that Hickson's allegations of negligence were not "actions in connection with" McClain's discharge, pursuant to OCGA § 37-3-4, and that the court thus erred in failing to find that Grady was immune from liability as a matter of law.

In 2011, House Bill 343, inter alia, "amend[ed] Chapter 3 of Title 37 of the Official Code of Georgia Annotated, relating to examination and treatment for mental illness, so as to provide for immunity for hospitals in certain circumstances; to provide for related matters; to repeal conflicting laws; and for other purposes."[7] The

---

[5] *Doctors Hosp. of Augusta v. Alicea*, 332 Ga. App. 529, 540 (1) (774 SE2d 114) (2015) (citation and punctuation omitted).

[6] Id.

[7] Ga. L. 2011, p. 346, § 2.

amendment added the emphasized text,[8] so that the current version of OCGA § 37-3-4 now provides:

> Any *hospital or any* physician, psychologist, peace officer, attorney, or health official, or any hospital official, agent, or other person employed by a private hospital or at a facility operated by the state, by a political subdivision of the state, or by a hospital authority created pursuant to Article 4 of Chapter 7 of Title 31, who acts in good faith in compliance with the admission and discharge provisions of this chapter shall be immune from civil or criminal liability for his *or her* actions in connection with the admission of a patient to a facility or the discharge of a patient from a facility*; provided, however, that nothing in this Code section shall be construed to relieve any hospital or any physician, psychologist, peace officer, attorney, or health official, or any hospital official, agent, or other person employed by a private hospital or at a facility operated by the state, by a political subdivision of the state, or by a hospital authority created pursuant to Article 4 of Chapter 7 of Title 31, from liability for failing to meet the applicable standard of care in the provision of treatment to a patient.*[9]

Thus, while the statute provides immunity for failure to follow the notice requirements and other procedures involved in admitting and discharging patients,

---

[8] See id.

[9] OCGA § 37-3-4 (emphasis supplied).

it does not provide immunity for failure to properly evaluate and/or treat patients between their arrival and discharge.

Grady argues that the purpose of the 2011 amendment was to expand the scope of the immunity protection, not restrict it. According to Grady, "[t]he amendment added the word 'hospital'[10] and clarified what was already known, i.e., that immunity only applies to 'actions in connection with' the admission or discharge [of a patient], not to claims regarding the general 'provision of treatment to a patient.'" In fact, the parties appear to agree that the amendment "reaffirm[ed] the long-recognized policy that physicians may be held liable for failing to meet the applicable standard of care."[11]

---

[10] Grady contends that the amendment "explicitly addressed" an issue raised in a 12-0 decision by this Court, which held: "The plain language of the [pre-2011] statute extends immunity only to designated individuals and does not evidence a legislative intent to confer immunity on hospitals or other mental health facilities[.] Had the General Assembly intended to include hospitals or mental health facilities within the ambit of the statute, it could have done so expressly." *Krachman v. Ridgeview Institute*, 301 Ga. App. 361, 364 (1) (687 SE2d 627) (2009).

[11] See *Peterson v. Reeves*, 315 Ga. App. 370, 374 (3) (727 SE2d 171) (2012) (physical precedent only); see also Court of Appeals Rule 33.2 (a) (2) ("If an appeal is decided by this Court sitting en banc, an opinion, or portion of an opinion, in which a majority of participating judges fully concur is binding precedent. An opinion is physical precedent only (citable as persuasive, but not binding, authority), however, with respect to any portion of the published opinion in which concurrences in the judgment only, *special concurrences without a statement of agreement with all that*

OCGA § 37-3-1 (17) provides that, as used in Chapter 3 of Title 37, "'[t]reatment' means care, diagnostic and therapeutic services, including the administration of drugs, and any other service for the treatment of an individual."[12] Thus, considering this broad definition of "treatment," the plain language of OCGA § 37-3-4, and the undisputed evidence in the record, we conclude that the trial court properly ruled that Grady was not entitled to summary judgment.

In reaching this conclusion, we note the brief lapse of time between McClain's arrival at the ED at 3:13 a.m.; Dr. Lloyd's "[s]uicidal, bipolar/anxiety" diagnosis at 6:46 a.m.; Kinchen's interception of McClain before he was transported to the psychiatric floor; her unsolicited reassessment of McClain and her conclusion that, despite having recently been given sedatives, he had no current suicidal ideations; and Dr. Mould-Millman's concurrence with this assessment.

---

*is said*, or dissent result in a full concurrence by fewer than a majority of the participating judges in that portion of the opinion. The opinion of a case that is physical precedent shall be marked as such when it is cited.") (emphasis supplied).

[12] See also OCGA § 37-3-1 (13) (defining "patient" for purposes of Chapter 3 as "any mentally ill person who seeks treatment under this chapter or any person for whom such treatment is sought[ ]").

We hold that the trial court did not err in finding that genuine issues of material fact exist regarding Grady's liability for its treatment of McClain. We turn now to Grady's immunity from liability for acts it took in discharging McClain.

2. Grady also argues that the trial court erroneously conflated the distinction between "good faith" and negligence in determining whether Grady "act[ed] in good faith in compliance with the admission and discharge provisions" of Chapter 3, thus "[r]endering OCGA § 37-3-4 [m]eaningless."

"OCGA § 37-3-4 provides defendants with 'an affirmative defense,' or a shield against liability."[13] Thus, Grady has the burden of proving that it is immune from liability.[14]

> Good faith has been defined as a state of mind indicating honesty and lawfulness of purpose; belief that one's conduct is not unconscionable or that known circumstances do not require further investigation. Ordinarily, good faith is a question for the jury based on a consideration of the facts and circumstances of the case. But summary judgment is

[13] *Curles v. Psychiatric Solutions*, 343 Ga. App. 719, 724 (1) (b) (808 SE2d 237) (2017).

[14] See *Doctors Hosp. of Augusta*, 332 Ga. App. at 536 (1) ("Immunity under [OCGA § 31-32-10 (a), for good faith reliance on any direction or decision by a health care agent,] is an affirmative defense, and thus the [d]efendant[ medical providers] had the burden of proving that they were immune from liability.").

11

appropriate in cases where *no evidence* supports a finding of lack of good faith.[15]

Construing the evidence in favor of Hickson, we cannot conclude as a matter of law that Grady complied in good faith with the discharge provisions of Chapter 3.[16] For example, there is evidence that Kinchen knowingly defied an order by an emergency room attending physician to admit a patient, consulted with another emergency room attending physician instead of an attending psychiatrist to complete the reassessment, and acted in violation of Grady's own policies with respect to her recommendation to discharge McClain without attempting to corroborate his personal history from family members and without a documented safety plan. Thus, Grady did not meet its burden, and we find no error in the trial court's denial of summary judgment.

3. Grady contends that the trial court improperly concluded that a question of good faith remained for jury resolution as to whether it provided sufficient notice of discharge to the admitting physician under OCGA § 37-3-43 (c). Grady argues that,

_____

[15] *Purcell v. Breese*, 250 Ga. App. 472, 476 (4) (552 SE2d 865) (2001) (punctuation and footnotes omitted; emphasis supplied).

[16] See id. at 477 (4).

12

even if Grady's "constructive notice" failed to fully comply with the notice provision, Grady substantially complied by writing "rescinded" in McClain's electronic medical records. Quoting the decision of the Supreme Court of Georgia in *Ga. Dept. of Human Resources v. Peeks*,[17] Grady adds that "'[n]o provision of Chapter 3 of Title 37 expressly prevents or precludes' constructive notice."[18]

OCGA § 37-3-43 (c) provides, in relevant part, that "[n]otice of any proposed discharge shall be given to the patient and his representatives; if the patient was admitted to the facility under subsection (a) of Code Section 37-3-41, to the physician or psychologist who executed the certificate[.]" The statute does not state what type of notice must be given in this situation.

Construing the evidence in the light most favorable to Hickson, we cannot conclude as a matter of law that Grady acted in good faith in complying with the

---

[17] 261 Ga. 96, 97 (1) (403 SE2d 36) (1991) ("No provision in Chapter 3 of Title 37 expressly prevents a treating physician from acting as chief medical officer for purposes of discharging his or her patients. In fact, [OCGA] § 37-3-21, read in pari materia with [OCGA] § 37-3-1 (1), permits such a designation."); see also id. at 97 (2) (concluding that the chief medical officer substantially complied with OCGA § 37-3-1 (1), and that his failure to appoint the treating physician in writing did not create an issue of fact regarding the chief medical officer's good faith compliance under OCGA § 37-3-4).

[18] (Punctuation omitted.)

statutory requirement to give notice to Dr. Lloyd of the "proposed" discharge. Dr. Lloyd's shift ended at 7:00 a.m., and he estimated that he left the hospital between 7:15 and 8:00 a.m. Dr. Mould-Millman noted at 8:07 a.m. that he was rescinding the 1013; 34 minutes later, at 8:41 a.m., McClain was discharged.

Grady argues that, "even if [its] 'constructive notice'[19] in lieu of 'actual notice' expressly failed to 'fully' comply with the notice provision, Grady still would be in substantial compliance with the notice provision." Relying on *Peeks*,[20] Grady contends that any technical violation of the notice provision created no harm because, "had Mould-Millman provided 'actual notice' to Dr. Lloyd, Dr. Lloyd would have agreed with Dr. Mould-Millman's decision to rescind McClain's 1013 and discharge him."

---

[19] According to Grady's appellate brief, "the trial court acknowledged that Grady provided 'constructive notice' in this case." We question this characterization of the trial court's order. The trial court concluded its order by noting that one of the issues of fact that remained for the jury was "[w]hether the note placed in McClain's medical file after the fact constitute[d] constructive notice."

[20] 261 Ga. at 97 (2).

*Peeks* is clearly distinguishable. In that case, the Supreme Court held that the chief medical officer's "non-compliance with the writing requirement[21] created no harm, as the appointment of [the] primary treating physician [to act as the chief medical officer's designee] and [the primary treating physician's] subsequent discharge of [the patient] pursuant to hospital policy accomplished the same result as a written appointment."[22]

Dr. Lloyd testified that, "in retrospect[,]" given the notes he had from Kinchen and Dr. Mould-Millman in front of him at his deposition 45 months later, the decision "doesn't seem unreasonable." However, as shown above, "[w]hen [Dr. Lloyd] left [McClain], [Dr. Lloyd] did not think that [McClain's] mental status would clear up and that he could be discharged." McClain received a sedative shortly thereafter. Giving Hickson the benefit of all favorable inferences,[23] the evidence does not

---

[21] See OCGA § 37-3-1 (1) ("'Chief medical officer'" means the physician with overall responsibility for patient treatment at any facility receiving patients under this chapter or a physician appointed in writing as the designee of such chief medical officer.").

[22] *Peeks*, 261 Ga. at 97 (2).

[23] See *Hawkins v. DeKalb. Med. Center*, 313 Ga. App. 209, 209-210 (721 SE2d 131) (2011).

establish that Dr. Lloyd would have agreed with the discharge decision such a short time after he signed the 1013 certificate.

Accordingly, the trial court did not err in denying Grady's motion for summary judgment.

*Judgment affirmed. Miller, P. J., and Rickman, J., concur.*