**FOURTH DIVISION**
**BARNES, P. J.,**
**RAY, and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**June 17, 2015**

# In the Court of Appeals of Georgia

A15A0107. DOCTORS HOSPITAL OF AUGUSTA, LLC et al. v. ALICEA.

BARNES, Presiding Judge.

This appeal raises questions pertaining to the immunity of health care providers and facilities under the Georgia Advance Directive for Health Care Act, OCGA § 31-32-1 et seq. ("Advance Directive Act") and to the law of informed and basic consent. The plaintiff, as administrator of the estate of her grandmother, sued Doctors Hospital of Augusta, LLC and Dr. Phillip William Catalano, alleging that they intubated the plaintiff's grandmother and placed her on mechanical ventilation, which prolonged her life when she was in a terminal condition and caused her unnecessary pain and suffering, contrary to the grandmother's advance directive and the specific directions of her designated health care agent. The plaintiff asserted claims for, among other things, medical malpractice for lack of informed consent and medical battery for lack of basic consent.

The defendants moved for summary judgment, contending that the uncontroverted evidence showed that they were immune from liability for intubating the grandmother on March 7, 2012 based on OCGA § 31-32-10 (a) (2) and (3) of the Advance Directive Act; that they obtained informed consent for a March 5, 2012 surgical procedure performed on the grandmother; and that they obtained basic consent for the March 5 procedure and March 7 intubation. The trial court denied summary judgment to the defendants on these claims.

For the reasons discussed below, we affirm the trial court's denial of the defendants' motion for summary judgment on their defense of statutory immunity and on the plaintiff's medical battery claim for lack of basic consent to the March 7 intubation. However, we reverse the trial court's denial of summary judgment to the defendants on the plaintiff's claims based on the alleged lack of basic and informed consent relating to the grandmother's March 5 surgical procedure.

Summary judgment is appropriate only if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c). We review the denial of summary judgment de novo and view the evidence in the light most favorable to

2

the nonmoving party. *Hood v. Todd*, 287 Ga. 164, 165 (695 SE2d 31) (2010). Guided by these principles, we turn to the record in the present case.

*Stephenson's Advance Directive for Healthcare.* In November 2009, Bucilla C. Stephenson executed an advance directive for healthcare (the "Advance Directive").[1] In her Advance Directive, Stephenson designated Jacqueline Alicea, her granddaughter with whom she lived, as her health care agent if she became "incapable of making [her] own decisions." She granted Alicea the unlimited authority "to make all health-care decisions for [her], including decisions to provide, withhold, or withdraw artificial hydration and nutrition, and all other forms of health care to keep [her] alive." Alicea was authorized to consent or refuse consent to any medical treatment or procedure and to direct the withholding of cardiopulmonary resuscitation ("CPR") and other forms of health care.

Additionally, in her Advance Directive, Stephenson instructed her health care providers and others involved in her care not to prolong her life under the following circumstances: (1) when she had an incurable and irreversible condition that would result in her death within a relatively short period of time; (2) when she became

---

[1] Stephenson's Advance Directive varied from the model form set out in OCGA § 31-32-4. However, none of the parties dispute that the Advance Directive was valid under Georgia law. See OCGA § 31-32-5 (b).

3

unconscious and, to a reasonable degree of medical certainty, would not regain consciousness; or (3) when the likely risks and burdens of treatment outweighed the expected benefits. The Advance Directive did not specifically list or define the medical technology that Stephenson did or did not desire to be used as part of her medical care. But Stephenson informed her family members that she did not want to be kept alive "on any machines" at the hospital, including a ventilator, if her condition was terminal.

*Stephenson's Admission to Doctor's Hospital.* In late February 2012, Stephenson, then 91 years old, developed a persistent cough. On the morning of March 3, 2012, Stephenson awoke lethargic and "not very responsive," and she lost consciousness and bowel control when Alicea was bathing her. Alarmed by Stephenson's condition, Alicea and her husband drove Stephenson to the Doctor's Hospital emergency room.

Upon arrival at the emergency room, Stephenson was disoriented and unable to complete a sentence because of her shortness of breath. Stephenson was examined in the emergency room and subsequently was admitted to Doctors Hospital after her blood work and a chest x-ray showed that she was suffering from pneumonia, sepsis, and acute renal failure.

Alicea provided the hospital with a copy of Stephenson's Advance Directive and her contact information so that she could be consulted about Stephenson's care if she were away from the hospital. Hospital policy required that upon admission to the hospital, a copy of a patient's advance directive be placed in the front of the medical record behind the admission tab to ensure that it was readily available to all physicians and hospital staff. A copy of Stephenson's Advance Directive was placed in her medical record, but not behind the admission tab where it could easily be seen and reviewed.

*Alicea's Communications to the Physicians.* On the morning following Stephenson's admission, Alicea was at home preparing to return to the hospital when she received a phone call from Dr. Catalano, a thoracic and cardiovascular surgeon with staff privileges at Doctors Hospital. Dr. Catalano informed Alicea that Stephenson was being moved to the intensive care unit ("ICU") where he would be treating her and that he planned to perform a computed tomography ("CT") scan to better assess her condition. During the phone call, Alicea told Dr. Catalano about Stephenson's Advance Directive and specifically instructed that no CPR should ever be administered and "no heroic measures" employed.

The CT scan performed on March 4 showed that the pneumonia was causing a build-up of fluid around Stephenson's lung that was displacing her heart. Around 2:30 p.m. that same day, Alicea received a phone call from Dr. Carmel Joseph, an ICU physician, who wanted to perform a thoracentesis, a therapeutic procedure that involved inserting a tube into Stephenson's chest to drain the fluid around the lung. Alicea consented to the thoracentesis during the phone call.

Repeating what she told Dr. Catalano earlier that day, Alicea informed Dr. Joseph during their phone call that although she was consenting to the thoracentesis, Stephenson wanted no "heroic measures" to prolong her life and that there was to be no CPR because she feared that Stephenson would be injured during chest compressions. Alicea also specifically directed Dr. Joseph that no intubation be performed or mechanical ventilation be used on Stephenson without first calling her for permission.[2] Under hospital policy, any discussions between a physician and family members regarding an advance directive were to be documented in the progress notes on the patient's medical chart. Pursuant to that policy, Dr. Joseph

_____

[2] Intubation involves passing a plastic tube through the mouth of the patient down into her airway. The plastic tube is then connected to a ventilator that controls the patient's breathing.

made two notations in his March 4 progress note that Stephenson was "no CPR" and that Alicea was to be called "before patient is intubated."

After his phone call with Alicea, Dr. Joseph performed the thoracentesis, which revealed pockets of pus within Stephenson's chest cavity outside of her lungs. Concerned that Stephenson faced an imminent risk of death from overwhelming infection in her chest cavity, the physicians involved in Stephenson's care agreed that Dr. Catalano would consult with Stephenson's family about performing an additional surgical procedure to drain the pus.

*The March 5 Surgical Procedure.* On the morning of March 5, Alicea received a telephone call from Dr. Catalano, who asked for her consent to perform the surgical procedure to drain more fluid from Stephenson's lung cavity. He told Alicea he would insert a tube for drainage and that Stephenson would be under general anesthesia for the procedure. Dr. Catalano had not reviewed the progress notes in the medical chart and did not inform Alicea that the procedure would require intubation. Unaware that Stephenson would be intubated, Alicea consented to the procedure.

Dr. Catalano performed the surgical procedure later that day. He cleaned out the infected area of Stephenson's chest cavity and removed portions of the lung upon discovering that the tissue was necrotic. Once the procedure was completed,

7

Stephenson was extubated (i.e., the tube inserted into her airway was removed) and taken off the ventilator.

*The March 7 Intubation.* Following the March 5 surgical procedure, Stephenson's condition continued to deteriorate, and by approximately 4:00 a.m. on March 7, she was unable to respond to questions from the ICU nurses and "was beginning to go into respiratory failure." Despite the notation in the progress notes that there was to be no CPR or intubation without calling Alicea, the nurses did not contact Alicea, who had gone home for the night. Instead, one of the nurses called Dr. Catalano at home around 4:00 a.m. and asked him to give an order for Stephenson to be intubated. Although Alicea had told Dr. Catalano on March 4 that Stephenson had an Advance Directive and he knew that Alicea was the designated health care agent, Dr. Catalano had not reviewed the Advance Directive since that time and did not contact Alicea upon receiving the phone call from the ICU nurse. Furthermore, although hospital policy was to document conversations regarding an advance directive in the progress notes, Dr. Catalano had not reviewed the progress notes regarding Stephenson's care.

Without contacting Alicea for permission, Dr. Catalano gave the order to intubate Stephenson. Based on Dr. Catalano's order, Dr. Troy Coon, the on-duty

8

physician in the emergency room, came to the ICU and intubated Stephenson around 4:50 a.m.

Later that morning, Alicea's husband visited Stephenson in the ICU and was surprised to find her intubated and on a ventilator. After her husband called and informed her of the intubation, Alicea returned to the hospital. Alicea spoke with the ICU nurses and asked them to locate the hospital's copy of Stephenson's Advance Directive. The nurses initially could not find the hospital's copy but ultimately located it in Stephenson's medical chart at the ICU main desk. When Alicea demanded to know why Stephenson had been intubated without calling her first for permission, the nurses asked Dr. Michael Behnia, the attending pulmonologist who was managing Stephenson's overall care in the ICU, to speak with Alicea about the situation.

Dr. Behnia advised Alicea of the circumstances of the early morning intubation and of Stephenson's condition and treatment options. He informed Alicea that she could authorize an extubation and the removal of the ventilator, and that to do so would cause Stephenson to suffocate. Alicea was further advised that, alternatively, she could authorize the medical team to continue to treat Stephenson, including a

9

second surgical procedure by Dr. Catalano to clean out more pus from the chest cavity.

Alicea showed the Advance Directive to Dr. Behnia and told him that the hospital had failed to follow Stephenson's wishes by intubating her and placing her on a ventilator, but that "since they put her on it, they had to take care of her." Alicea drew a distinction between never placing Stephenson on a ventilator and "let[ting] nature take its course," and taking the affirmative step of removing her from the ventilator now that she was already on it. According to Alicea, she now "had to make the decision that [she] wasn't supposed to have to make." Declining to have Stephenson extubated and the ventilator removed at that point, Alicea chose to continue treatment for Stephenson and consented to the second surgery by Dr. Catalano, which he performed on March 8.

*Stephenson's Subsequent Medical Procedures.* As Stephenson's condition continued to deteriorate after the March 8 surgery, a number of additional medical procedures and interventions were performed on the advice of Stephenson's physicians and with Alicea's consent, including the placement of a feeding tube, a bronchoscopy to remove pus from the airway, and a tracheostomy to provide an airway and remove lung secretions. Stephenson remained in the ICU until March 14,

10

when Alicea and the attending physicians authorized the removal of Stephenson from the ventilator, the entry of a "Do Not Resuscitate" order, and the provision of comfort measures only from that point forward. Stephenson died on March 17.

*Procedural Background.* On May 14, 2013, Alicea, as the administrator of the estate of Stephenson, filed her complaint for damages against Dr. Catalano and Doctors Hospital (collectively, the "Defendants"), alleging claims of breach of agreement, professional and ordinary negligence, medical battery, intentional infliction of emotional distress, and breach of fiduciary duty for injuries allegedly arising out of the care and treatment of Stephenson at Doctors Hospital.[3] The complaint alleged that Dr. Catalano and the nurses and other medical personnel associated with Doctors Hospital had caused Stephenson pain, suffering, and emotional distress by subjecting her to unnecessary medical procedures, specifically intubation and placement on a ventilator on March 5 and March 7, when she was terminally ill, in violation of her Advance Directive and the instructions of Alicea as

_____

[3] The complaint also named Dr. Coon and his employer, CSRA Emergency Physicians, P.C., as defendants. The trial court granted summary judgment in favor of Dr. Coon and his employer on all of Alicea's claims. Alicea has not appealed that ruling.

11

her designated health care agent. The complaint sought compensatory and punitive damages, together with attorney fees and the expenses of litigation.

Alicea relied upon an expert on gerontology, geriatrics, and palliative care[4] to support her claims.[5] The expert opined that when Stephenson arrived at the emergency room on March 4, "she had an incurable and irreversible condition that was likely to result in her death within a relatively short period of time thereafter." Consequently, the expert opined that the Defendants were required under the standard of care to refrain from taking steps to prolong Stephenson's life in accordance with

[4] Gerontology is "[t]he scientific study of the biological, psychological, and sociological phenomena that are associated with old age and aging." The American Heritage Medical Dictionary. (2007). Retrieved May 22, 2015 from http://medical-dictionary.thefreedictionary.com/gerontology. Geriatrics is "[t]he branch of medicine that deals with the diagnosis and treatment of diseases and problems specific to old age." Id. Retrieved May 22 2015 from http://medical-dictionary.thefreedictionary.com/Geriatrics. Palliative care refers to treatments aimed at "[r]elieving or soothing the symptoms of a disease or disorder without effecting a cure. Id. Retrieved May 22, 2015 from http://medical-dictionary.thefreedictionary.com/palliative.

[5] The Defendants assert that Alicea's expert was not qualified to testify under OCGA § 24-7-702. The record reflects that after the trial court entered its summary judgment order, the Defendants raised the qualification issue in a motion to strike the affidavit and opinions of Alicea's expert, but the trial court has not ruled on that motion and thus it remains pending below. Given this record, the qualification issue is not ripe for our review and will not be addressed on appeal. See *Dempsey v. Gwinnett Hosp. System*, 330 Ga. App. 469, 474 (1) (b) (765 SE2d 525) (2014); *Renz v. Northside Hosp.*, 285 Ga. App. 882, 884 (1) (648 SE2d 186) (2007).

12

her Advance Directive and the instructions of her designated health care agent, Alicea. According to the expert, Dr. Catalano breached the standard of care by failing to review Stephenson's Advance Directive and the progress notes in her medical chart to determine if Alicea had given any directions for Stephenson's care; by failing to obtain basic and informed consent from Alicea before the March 5 surgical procedure involving intubation; and by failing to obtain basic consent from Alicea before the March 7 intubation. The expert further opined that the nurses employed by Doctors Hospital had violated the standard of care by failing to contact Alicea before the March 7 intubation and failing to call Dr. Catalano's attention to Stephenson's Advance Directive and the notation in the progress notes regarding intubation.

Alicea later testified in her deposition that she would not have consented to Stephenson's March 5 surgical procedure if she had been told it would involve intubation, and would not have consented to the March 7 intubation if she had been called before it occurred. According to Alicea, if she had been told on March 5 that the proposed procedure involved intubation, she would have authorized only less invasive procedures such as a thoracentesis, and if she had been called on March 7, she would have authorized only comfort measures from that point forward rather than intubation.

Dr. Catalano conceded in his deposition that he knew that Alicea was Stephenson's health care agent under the Advance Directive but did not contact her before the March 7 intubation. Nor had he reviewed the Advance Directive or the March 4 progress note containing Alicea's direction that no intubation occur without calling her first. Dr. Catalano testified that because the family had authorized the March 5 surgical procedure on Stephenson that had involved general anesthesia, and "obviously [he] had to intubate her to do [that] surgery," he had believed there would be no objection to the March 7 intubation. Later in his deposition, Dr. Catalano testified that he had decided it would be better to order the intubation on March 7 and then consult the family later about whether they wanted to remove the ventilator: "[W]hen this happened I really didn't go into any of the code/no code / do not intubate/resuscitate. Save the patient's life first and then we'll do whatever it takes to make the family and the patient whatever, but we can't undo death. So that's what I was thinking."

Following discovery, the Defendants moved for summary judgment. The Defendants contended that they were shielded from liability for any claims relating to the March 7 intubation under the immunity provisions of OCGA § 31-32-10 (a) (2)

14

and (3), and that any claims for lack of basic and informed consent for the March 5 surgical procedure and the March 7 intubation failed as a matter of law.

After conducting a hearing, the trial court granted in part and denied in part the Defendants' motion for summary judgment. Specifically, the trial court granted summary judgment to the Defendants with respect to any informed consent claim based on the March 7 intubation, finding as a matter of law that intubation was not a medical procedure that required informed consent under Georgia law as set forth in OCGA § 31-9-6.1 (a).[6] The trial court denied the Defendants' motion for summary judgment as to all remaining claims and issues, including whether the Defendants were entitled to immunity for the March 7 intubation under OCGA § 31-32-10 (a), whether there was basic and informed consent for the March 5 surgical procedure, and whether there was basic consent for the March 7 intubation.

In conjunction with its summary judgment order, the trial court granted a certification of immediate review. The Defendants filed an application for interlocutory appeal, which we granted. This appeal followed.

---

[6] Alicea has not filed a cross-appeal challenging the trial court's grant of summary judgment to the Defendants on the informed consent claim pertaining to the March 7 intubation.

15

1. The Defendants contend that the trial court erred in denying their motion for summary judgment on Alicea's claims pertaining to the March 7 intubation because the uncontroverted evidence showed that they were entitled to immunity under OCGA § 31-32-10 (a) (2) and (3). Immunity under the statute is an affirmative defense, and thus the Defendants had the burden of proving that they were immune from liability. See *Heath v. Emory Univ. Hosp.*, 208 Ga. App. 629, 631 (2) (431 SE2d 427) (1993) (defendants had burden of proving affirmative defense of statutory immunity for good faith compliance with procedures for holding a patient in a mental health facility after the patient has requested discharge). We conclude that the trial court properly denied summary judgment to the Defendants on the immunity question because genuine issues of material fact exist regarding whether the Defendants made a good faith effort to rely on the directions and decisions of Alicea, Stephenson's health care agent under her Advance Directive, in carrying out the March 7 intubation.

The Advance Directive Act is codified at OCGA §§ 31-32-1 through 31-32-14. In adopting the current version of the Act, the General Assembly noted that it "has long recognized the right of the individual to control all aspects of his or her personal care and medical treatment, including the right to insist upon medical treatment,

16

decline medical treatment, or direct that medical treatment be withdrawn," and that "the clear expression of an individual's decisions regarding health care, whether made by the individual or an agent appointed by the individual, is of critical importance not only to citizens but also to the health care and legal communities, third parties, and families." Ga. L. 2007, p.133, § 1 (a), (d).

Among other things, the Advance Directive Act authorizes an adult of sound mind (the "declarant") to execute a document designating a health care agent to make decisions on his or her behalf when the "declarant is unable or chooses not to make health care decisions for himself or herself." OCGA §§ 31-32-2 (3), (6); 31-32-5 (a) (1). The health care agent may consent to or refuse any medical care or treatment for the declarant, including any surgical or life-sustaining procedures. OCGA § 31-32-7 (e) (1). The agent must exercise his or her powers "consistent with the intentions and desires of the declarant" if known, but if the declarant's wishes are unclear, the agent must "act in the declarant's best interest considering the benefits, burdens, and risks of the declarant's circumstances and treatment options." OCGA § 31-32-7 (b).

When the designated agent notifies a health care provider of a decision regarding the declarant's medical care or treatment, the provider must abide by the agent's decision, "subject to the health care provider's right to administer treatment

17

for the declarant's comfort and alleviation of pain." OCGA § 31-32-8 (2). However, OCGA § 31-32-10 (a) (2) and (3) of the Advance Directive Act affords health care providers and facilities[7] immunity from liability for the refusal or failure to comply with a health care agent's decision, so long as certain conditions are met.[8] Specifically, OCGA § 31-32-10 (a) provides in part:

(a) Each health care provider, health care facility, and any other person *who acts in good faith reliance on any direction or decision by the*

---

[7] It is undisputed that as a licensed hospital established under the laws of Georgia, Doctors Hospital satisfied the statutory definition of a "health care facility" under the Advance Directive Act. See OCGA § 31-32-2 (7). It is likewise undisputed that as a licensed attending physician permitted by law to administer health care, Dr. Catalano met the Advance Directive Act's definition of a "health care provider." See OCGA § 31-32-2 (8).

[8] OCGA § 31-32-10 (b) provides immunity from civil liability "for failing or refusing in good faith to effectuate the *declarant's* directions regarding the withholding or withdrawal of life-sustaining procedures or the withholding or withdrawal of the provision of nourishment or hydration." (Emphasis supplied.) The Defendants did not rely upon this provision in the trial court as a basis for immunity, and we will not consider it for the first time on appeal. See *Wellons, Inc. v. Langboard, Inc.*, 315 Ga. App. 183, 186 (1) (726 SE2d 673) (2012) ("Appellate courts do not consider whether summary judgment should have been granted for a reason not raised below because, if they did, it would be contrary to the line of cases holding that a party must stand or fall upon the position taken in the trial court.") (citation and punctuation omitted).

18

*health care agent* shall be protected and released to the same extent as though such person had interacted directly with the declarant as a fully competent person. Without limiting the generality of the foregoing, the following specific provisions shall also govern, protect, and validate the acts of the health care agent and each such health care provider, health care facility, and any other person *acting in good faith reliance on such direction or decision*:

(1) No such health care provider, health care facility, or person shall be subject to civil or criminal liability or discipline for unprofessional conduct solely for complying with any direction or decision by the health care agent, even if death or injury to the declarant ensues;

(2) *No such* health care provider, health care facility, or person shall be subject to civil or criminal liability or discipline for unprofessional conduct solely for failure to comply with any direction or decision by the health care agent, as long as such health care provider, health care facility, or person promptly informs the health care agent of such health care provider's, health care facility's, or person's refusal or failure to comply with such direction or decision by the health care agent. The health care agent shall then be responsible for arranging the declarant's transfer to another health care provider. A health care provider who is unwilling to comply with the health care agent's decision shall continue to provide reasonably necessary consultation and care in connection with the pending transfer;

(3) If the actions of a health care provider, health care facility, or person who fails to comply with any direction or decision by the health care agent are substantially in accord with reasonable medical standards at the time of reference and the provider cooperates in the transfer of the declarant pursuant to paragraph (2) of Code Section 31-32-8,[9] the health care provider, health care facility, or person shall not be subject to civil or criminal liability or discipline for unprofessional conduct for failure to comply with the advance directive for health care . . . .

(Emphasis supplied.)

The immunity question raised in this case centers on the Defendants' "failure to comply" with Alicea's direction to contact her and obtain permission before

---

[9] OCGA § 31-32-8 (2) provides:
A health care decision made by a health care agent in accordance with the terms of an advance directive for health care shall be complied with by every health care provider to whom the decision is communicated, subject to the health care provider's right to administer treatment for the declarant's comfort or alleviation of pain; provided, however, that if the health care provider is unwilling to comply with the health care agent's decision, the health care provider shall promptly inform the health care agent who shall then be responsible for arranging for the declarant's transfer to another health care provider. A health care provider who is unwilling to comply with the health care agent's decision shall provide reasonably necessary consultation and care in connection with the pending transfer.

20

intubating Stephenson and placing her on a ventilator on March 7.[10] By its plain language, OCGA § 31-32-10 (a) (2) and (3) afford immunity to a health care provider or facility that fails to comply with a direction of the health care agent if: the provider or facility promptly informed the agent of the failure to comply with the agent's direction; the actions of the health care provider or facility that failed to comply with the agent's direction were "substantially in accord with reasonable medical standards at the time of reference"; and the provider or facility cooperated in the transfer of the declarant at the behest of the agent and provided reasonably necessary consultation and care of the declarant in connect with the pending transfer.

In addition to these elements, Alicea argues that when the statute is read as a whole, immunity for the failure to comply with a health care agent's direction under OCGA § 31-32-10 (a) (2) and (3) requires a showing that the health care provider or facility was acting in good faith reliance on the directions and decisions of the agent. In contrast, the Defendants suggest that good faith reliance, referenced in the introductory clause of the statute, is not an element of proving immunity for a

_____

[10] Because the Defendants never argued in the trial court that they were entitled to immunity for the March 5 surgical procedure, we will not consider that issue on appeal. See *Wellons, Inc.*, 315 Ga. App. at 186 (1). We also note that this case does not involve a "refusal" by a health care provider to follow a health care agent's direction for religious or philosophical reasons.

provider or facility's failure to comply with an agent's direction under OCGA § 31-32-10 (a) (2) and (3). We agree with Alicea that good faith reliance must be taken into account as part of the immunity analysis.

Statutory construction is a question of law, and our review is de novo. *Hill v. First Atlantic Bank*, 323 Ga. App. 731, 732 (747 SE2d 892) (2013). "In construing a legislative act, a court must first look to the literal meaning of the act. If the language is plain and does not lead to any absurd or impracticable consequences, the court simply construes it according to its terms and conducts no further inquiry." (Punctuation and footnote omitted.) *Savannah Cemetery Group v. DePue-Wilbert Vault Co.*, 307 Ga. App. 206, 207 (1) (704 SE2d 858) (2010). Furthermore, "in construing language in any one part of a statute, a court should consider the entire scheme of the statute and attempt to gather the legislative intent from the statute as a whole." (Citation and punctuation omitted.) *Walker County v. Tri-State Crematory*, 292 Ga. App. 411, 414-415 (1) (664 SE2d 788) (2008). Different subsections of a statute should be read in pari materia, and we must strive to "reconcile them, if possible, so that they may be read as consistent and harmonious with one another." (Punctuation and footnote omitted.) *City of LaGrange v. Ga. Public Svc. Comm.*, 296 Ga. App. 615, 621 (2) (675 SE2d 525) (2009).

22

Applying these principles in the present case, we conclude that the immunity afforded by OCGA § 31-32-10 (a) (2) and (3) applies only where the health care provider or facility was making a good faith effort to rely on the decisions and directions of the health care agent when treating the declarant, but nevertheless failed to comply with a direction of the agent. The first sentence of the introductory clause of OCGA § 31-32-10 (a) refers to health care providers and facilities that act "in good faith reliance on any direction or decision by the health care agent," and the second sentence states that "without limiting the generality of the foregoing, the following specific provisions shall also govern, protect, and validate the acts of the health care agent and each such health care provider, health care facility, and any other person *acting in good faith reliance on such direction or decision*." (Emphasis supplied.) OCGA § 31-32-10 (a). The second sentence of the introductory clause then ends with a colon followed by several subsections, including subsections (a) (2) and (3), which address failures to comply with a health care agent's direction or decision. In turn, OCGA § 31-32-10 (a) (2) begins with the words "*no such* health care provider, health care facility, or person," linking the subsection to the introductory clause, and OCGA § 31-32-10 (a) (3) further elaborates on the conditions under which immunity can be obtained for failing to comply with an agent's direction or decision.

Taken together, the language, grammar, and structure of OCGA § 31-32-10 (a) reflect that the requirement of "good faith reliance" on a health care agent's direction or decision referenced in the introductory clause was intended to apply to the subsections that follow it, including subsections (a) (2) and (3) pertaining to a failure to comply with an agent's direction or decision. To reconcile and harmonize the introductory clause with these subsections and give effect to all the statutory language, we construe the immunity afforded by OCGA § 31-32-10 (a) (2) and (3) to arise only where the health care provider or facility made a good faith effort to rely on the directions and decisions of the health care agent in the medical care and treatment of the declarant that has been called into question. By construing the introductory clause and subsections in this manner, we avoid any apparent internal conflict in the statute and render the provisions consistent and harmonious with one another, as we are charged to do. *Ford Motor Co. v. Carter*, 239 Ga. 657, 661 (238 SE2d 361) (1977).

Accordingly, the Defendants, to prove that they were entitled to immunity under OCGA § 31-32-10 (a) (2) and (3) as a matter of law, had to establish that the uncontroverted evidence of record showed that they were making a good faith effort to rely on the directions and decisions of the health care agent, Alicea, when

24

Stephenson was intubated in the ICU on March 7. "Good faith" has been defined as "a state of mind indicating honesty and lawfulness of purpose; belief that one's conduct is not unconscionable or that known circumstances do not require further investigation." (Punctuation, and footnote omitted.) *O'Heron v. Blaney*, 276 Ga. 871, 873 (1) (583 SE2d 834) (2003). See *Anderson v. Little & Davenport Funeral Home*, 242 Ga. 751, 753 (1) (251 SE2d 250) (1978). "Ordinarily, good faith is a question for the jury based on a consideration of the facts and circumstances of the case." *Purcell v. Breese*, 250 Ga. App. 472, 476 (4) (552 SE2d 865) (2001). See *Hodges v. Youmans*, 129 Ga. App. 481, 483 (3) (200 SE2d 157) (1973).

As previously discussed, Dr. Catalano testified in his deposition that he had believed he was carrying out the family's wishes in ordering the March 7 intubation because in his "framework of thinking" Alicea had authorized him to perform the March 5 surgical procedure involving general anesthesia that required intubation. Dr. Catalano's testimony would support a finding by a jury that he was making a good faith effort to rely on the directions and decisions of Alicea when he ordered Stephenson's intubation.

On the other hand, Dr. Catalano later testified in his deposition that he "didn't go into any of the code/no code / do not intubate/resuscitate" in deciding to intubate

25

Stephenson on March 7 because he had decided to place her on ventilation first and then give the family the choice whether to remove her from it. Additionally, there was evidence that Alicea had specifically told Dr. Catalano that Stephenson had an Advance Directive and that Alicea did not want CPR or "heroic measures" performed on Stephenson. Despite these communications, Dr. Catalano chose not to read the Advance Directive or to contact Alicea before ordering the intubation, even though up to 50 minutes passed between when he was called by the ICU nurses and when the intubation was performed. Dr. Catalano also chose not to review the progress notes in Stephenson's medical chart, which would have alerted him to Alicea's express direction that no intubation occur without her permission, even though hospital policy reflected that any communications between a physician and family members regarding an advance directive would be documented there, and Dr. Catalano conceded that he had seen and reviewed the hospital's policies pertaining to advance directives.

This combined evidence, when viewed in the light most favorable to Alicea as the non-moving party, creates a genuine issue of material fact as to whether Dr. Catalano made a good faith effort to rely on the directions and decisions of Alicea when he ordered the March 7 intubation. See *Purcell*, 250 Ga. App. at 477 (4)

(genuine issues of material fact precluded summary judgment on question of physician's good faith under different immunity statute, where there was evidence that, among things, the physician failed to call the patient's parents or review notes in the patient's file made by another physician that would have alerted him to the patient's need for further treatment). The trial court thus committed no error in denying summary judgment to Dr. Catalano on his immunity defense under OCGA § 31-32-10 (a) (2) and (3).

We reach the same result with respect to Doctors Hospital, which failed to point to any evidence reflecting that the nurses employed at the hospital who were involved in the March 7 intubation of Stephenson made a good faith effort to rely on the directions and decisions of Alicea as the designated health care agent. Because Doctors Hospital had the burden of proof on this issue, see *Heath*, 208 Ga. App. at 631 (2), the lack of evidence in the record regarding the good faith reliance of its nurses precluded the grant of summary judgment in its favor on the issue of immunity under OCGA § 31-32-10 (a) (2) and (3), as the trial court properly concluded.[11]

_____

[11] Because there are genuine issues of material fact regarding whether there was a good faith effort by the Defendants to rely on the directions and decisions of Alicea in carrying out the March 7 intubation, we need not address whether the other statutory conditions for immunity were met in this case. See generally *Lowry v. Cochran*, 305 Ga. App. 240, 241 (699 SE2d 325) (2010) ("We will affirm a trial

2. The Defendants also contend that the trial court erred in denying their motion for summary judgment on Alicea's medical malpractice claim for lack of informed consent based on the March 5 surgical procedure performed on Stephenson that involved intubation. According to the Defendants, Alicea failed to come forward with any evidence showing that Stephenson was injured by the March 5 procedure, and thus cannot succeed on her informed consent claim as a matter of law. We agree.

"Georgia does not recognize a common law duty to inform patients of the material risks of a proposed treatment or procedure[.]" *Blotner v. Doreika*, 285 Ga. 481 (678 SE2d 80) (2009). However, by statute,

> any person who undergoes any surgical procedure under general anesthesia . . . must consent to such procedure and shall be informed of the diagnosis, nature, and purpose of the surgical or diagnostic procedure, material risks of the procedure, likelihood of success, the practical alternatives to the procedure, and the prognosis if the procedure is rejected.

(Citation and punctuation omitted.) *Roberts v. Connell*, 312 Ga. App. 515, 518 (2) (718 SE2d 862) (2011). See OCGA § 31-9-6.1 (a). To bring an action for medical

court's denial of a motion for summary judgment if it is right for any reason.").

28

malpractice premised upon the failure to obtain informed consent for a procedure in accordance with OCGA § 31-9-6.1 (a), the plaintiff must present evidence showing that "the patient suffered an injury which was proximately caused by the surgical or diagnostic procedure." OCGA § 31-9-6.1 (d) (1).

In the present case, the March 5 surgical procedure involved general anesthesia and thus triggered a duty to inform Alicea, as Stephenson's health care agent, of the material risks associated with the procedure and the other information required to be disclosed under OCGA § 31-9-6.1 (a). Alicea claims that informed consent was not properly obtained from her for the March 5 surgical procedure because she was not told that Stephenson would be intubated and was not fully informed of the nature, purpose, prognosis, alternatives, and advisability of the proposed procedure. She seeks compensatory and punitive damages based on this alleged lack of informed consent.

Alicea, however, has failed to come forward with any evidence that Stephenson suffered an injury that was proximately caused by the March 5 surgical procedure. There is nothing in the record to suggest that the intubation and ventilation of Stephenson during the procedure injured her in any manner, and Stephenson was extubated and the ventilator was removed when the procedure was completed. Nor

29

is there any evidence that Stephenson experienced any adverse side effects or complications arising from the procedure, that her condition worsened from the procedure, or that she experienced any pain, suffering, or mental distress as a result of the procedure apart from what she was already experiencing as a result of her severe illness. Accordingly, we conclude that Alicea failed, as a matter of law, to satisfy the statutory requirement of showing an injury proximately resulting from the alleged lack of informed consent. See OCGA § 31-9-6.1 (d) (1). It follows that the trial court erred in denying summary judgment to the Defendants on Alicea's informed consent claim predicated on the March 5 surgical procedure.

3. Lastly, the Defendants contend that the trial court erred in denying their motion for summary judgment on Alicea's medical battery claim. We agree with the Defendants with respect to the March 5 surgical procedure, but not with respect to the March 7 intubation.

It is well-established that a competent adult patient has the right to refuse medical and surgical treatment. See OCGA § 31-9-7; *State v. McAfee*, 259 Ga. 579, 580 (1) (385 SE2d 651) (1989). If a health care agent has been designated for the patient in accordance with the Advance Directive Act, the agent may exercise the patient's right to refuse such treatment. OCGA § 3l -32-5 (a) (1); 31-32-7 (e) (1).

30

In addition to the legal principle of "informed consent" previously discussed in Division 2, consent to medical treatment encompasses the principle of "basic consent." *Paden v. Rudd*, 294 Ga. App. 603, 605 (2) (669 SE2d 548) (2008). "With respect to basic consent, a medical touching without consent constitutes the intentional tort of battery for which an action will lie." (Punctuation and footnote omitted.) Id. See *Prince v. Esposito*, 278 Ga. App. 310, 311 (1) (a) (628 SE2d 601) (2006). Continued treatment of a patient after consent has been withdrawn also will give rise to a medical battery claim. *Joiner v. Lee*, 197 Ga. App. 754, 756 (1) (399 SE2d 516) (1990). "Actual physical injury is not required to support a claim for battery, which is an intentional tort." (Citation and punctuation omitted.) *Lawson v. Bloodsworth*, 313 Ga. App. 616, 619 (722 SE2d 358) (2012).

Here, the uncontroverted evidence of record reflects that there was basic consent for the March 5 surgical procedure. Alicea consented to Dr. Catalano conducting a surgical procedure under general anesthesia to drain more fluid from Stephenson's lung cavity on that date. And while Alicea alleges that Dr. Catalano did not fully disclose to her the nature of the procedure (including that it would entail intubation), the likelihood of success, and the practical alternatives to the procedure,

31

those allegations reflect an informed consent, not a battery, claim.[12] See OCGA § 31-9-6.1 (a). Because the "purported failure to obtain . . . informed consent does not give rise to a claim of battery," *Paden*, 294 Ga. App. at 605 (2), the trial court erred in denying summary judgment to the Defendants on Alicea's battery claim based on the March 5 surgical procedure.

We reach a different result with respect to the March 7 intubation. Alicea specifically directed Dr. Joseph that no intubation of Stephenson was to occur until she had been called and had given consent, and Dr. Joseph placed this information in his March 4 progress note in the medical chart. Based on this evidence, a jury could find that the Defendants had notice of this specific limitation on Stephenson's medical care and treatment and thus were under an obligation to abide by it. See OCGA § 31-32-8 (2). Compare *Roberts v. Jones*, 222 Ga. App. 548, 549 (2) (475 SE2d 193) (1996) (physician could not be held liable for battery, where medical procedure limitation contained in advance directive was neither placed in the patient's medical chart nor told to the physician). Nevertheless, Dr. Catalano and the ICU nurses did not contact Alicea to obtain her consent before the March 7 intubation.

---

[12] As noted in Division 2, Alicea's informed consent claim predicated on the March 5 surgical procedure fails for lack of evidence of any injury.

Furthermore, given that there was evidence that approximately 50 minutes elapsed between the time Dr. Catalano was called and the intubation was performed, a jury could find that the situation was not so emergent that consent could not have been obtained from Alicea by calling her at home before performing the intubation. Under these circumstances, a jury must resolve whether the Defendants committed medical battery by performing the March 7 intubation, and the trial court committed no error in denying the Defendants' motion for summary judgment on this claim.[13]

In summary, we affirm the trial court's denial of the Defendants' motion for summary judgment on their immunity defense predicated on OCGA § 31-32-10 (a) (2) and (3) and on Alicea's medical battery claim predicated on the March 7 intubation. We reverse the trial court's denial of the Defendants' motion for summary judgment on Alicea's medical malpractice claim for lack of informed consent and on her medical battery claim predicated on the March 5 surgical procedure.

*Judgment affirmed in part; reversed in part. Ray and McMillian, JJ., concur.*

---

[13] The Defendants' reliance on *Pruette v. Ungarino*, 326 Ga. App. 584, 590-592 (3) (757 SE2d 199) (2014) (physical precedent only) is misplaced. *Pruette* addressed, among other things, whether certain expert testimony regarding what the defendant physician should have told the patient's family went to the issue of informed consent or basic consent and whether it should have been excluded from trial. In contrast, the issue in the present case is the more general one whether there was any evidence to support a battery claim for lack of basic consent to the March 7 intubation.