**FOURTH DIVISION**
**RICKMAN, C.J.**
**PINSON, J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**February 10, 2022**

# In the Court of Appeals of Georgia

A21A1639. ROBERT L. UNDERWOOD, JR. v. COLONY BANK.

PINSON, Judge.

Robert Underwood was indebted to Colony Bank under a series of loans, some of which were secured by the mortgage on his home. When Underwood fell behind on his loan payments, he and Colony signed a forbearance agreement, which set out a payment schedule and imposed other conditions. After Underwood missed a payment under the forbearance agreement schedule, Colony granted him another extension, in exchange for which Underwood tendered a deed to his home in lieu of foreclosure. Over the next few months, Underwood made a series of late and partial payments, which Colony accepted. Then, after Underwood made no payments for two months, Colony told him he had five days to pay one loan in full and bring another

loan current; if he did not, Colony would file the deed in lieu of foreclosure and take possession of his home.

Underwood sued Colony. The trial court granted summary judgment in Colony's favor on all counts. We affirm as to Underwood's claims for promissory estoppel, to set aside the deed in lieu of foreclosure, and for conversion or trover. But we reverse the grant of summary judgment on Underwood's breach of contract claim, because the evidence creates issues of material fact as to whether he and Colony, through their course of conduct, mutually departed from their contractual agreement, and whether Colony gave him adequate notice before enforcing the letter of the agreement.

**Background**

Robert Underwood was indebted to Colony Bank under three separate promissory notes. The first (the "Underwood note") named Underwood as the debtor. The second (the "ATech note") named Underwood's company, ATech Communications, LLC, as the primary debtor, with Underwood personally guaranteeing the loan. The third (the "Kayla note") named Underwood's wife, Kayla Underwood, as the debtor. Both the Underwood note and the ATech note were secured by Underwood's home, and the ATech note was further secured by ATech's

2

accounts receivable. The Kayla note was secured only by the accounts receivable. The combined original principal amount of the three notes was about $413,000.

By July 2019, both the Underwood note and the ATech note were in default. Colony, through counsel, informed Underwood by letter that it was accelerating the notes and that the loans were now immediately due. Colony also began the non-judicial foreclosure process, scheduling the sale of Underwood's home for September 3, 2019. Underwood attests that he never received the letter of default or any notice of foreclosure, and that he learned of the foreclosure only when he went to meet with Nic Worthy, the senior vice president of Colony, to "renew" the notes as he had done in the past.

In early August, a few weeks before the foreclosure sale, Colony and Underwood signed a forbearance agreement. Under the agreement, Colony would forbear collecting amounts due under the notes so long as the following conditions were met: (1) Underwood would make payments of $25,000 to Colony on August 8 (the date of the forbearance agreement), August 30, September 30, and October 31; (2) Underwood would pay off the ATech note in full; (3) Colony could apply the $25,000 payments at its discretion to the ATech or Kayla notes; (4) Underwood would stay current with the Underwood note; (5) the Underwood and ATech notes

3

would both remain accelerated and due in full until the terms of the agreement were satisfied; and (6) the foreclosure of the real property that secured the Underwood and ATech notes would go forward on September 3, unless and until Underwood made the first two $25,000 payments, in which case Colony would discontinue the sale. The forbearance agreement provided that it could not be modified except by writing signed by the parties.

Underwood apparently made the first $25,000 payment on August 8 as required. But he fell behind again, and as of September 3, the date of the foreclosure sale, Underwood was once again in arrears. That day, Underwood met again with Worthy.

At the meeting, Underwood presented Worthy with a deed to his home in lieu of foreclosure. The deed in lieu provided that it was given for consideration of $10, and that it was conveyed "in lieu of foreclosure upon" Colony's security deed to Underwood's home. The deed in lieu further stated that it was an "absolute conveyance" of the home and that "no other agreements, oral or written, exist[ed] with respect to the [p]roperty" between Underwood and Colony.

Underwood attests that Colony told him that tendering the deed in lieu would "give me more time to pay." Neither party contends that this representation was in writing. But a contemporaneous letter from Colony's counsel to Underwood's counsel memorialized what was agreed to at the September 3 meeting. According to the letter, Colony agreed to continue to forbear collecting on the notes, but Colony's counsel would hold onto the deed in lieu; if Underwood failed to make the remaining three payments under the forbearance agreement, Colony was authorized to record the deed and thus take possession of the home. The parties also agreed to push the deadline for the second payment from August 30 (which had already passed) to September 9. The letter stated: "This letter will constitute acceptance on behalf of your client to this additional term of the forbearance."

Over the next few months, Underwood made four more payments, none of which complied with the payment schedule of the forbearance agreement. Underwood paid Colony $20,000 on September 10; $12,500 on October 31; $2,200 on November 4; and $12,500 on December 23. Colony accepted these payments and applied them to the Kayla note—the one that was not secured by Underwood's home—until that note was paid in full. During this time, Underwood told Colony that he owned a convenience store that he could sell to pay off all remaining indebtedness.

5

Underwood now says Colony told him that the sale would "solve the problems" but also told him "not to worry." Underwood did not actually sell the convenience store until more than a year later, in March 2021.

The parties do not dispute that Underwood made no payments to Colony between December 23, 2019 and February 21, 2020. In a letter dated February 21, 2020, Colony's counsel informed Underwood's counsel that the Underwood and ATech notes were still in default, and that Underwood now had five days from the date of the letter to pay the ATech note in full and to make current his payments under the Underwood note. At the time, the outstanding balance of the ATech note was $46,187.90, and Underwood was $7,612.53 in arrears on the Underwood note, so the total payment for compliance was $53,800.43. Underwood attests that this letter was sent by first class mail and that he did not receive it until February 27 —after the due date for payment—although Colony points out that the letter was addressed to Underwood's lawyer, not to Underwood personally. In any event, Underwood did not make further payments. On February 28, Colony recorded the deed in lieu.

Underwood sued Colony for breach of contract, promissory estoppel, to set aside the deed in lieu of foreclosure, and conversion or trover of real property. Colony

moved for summary judgment on all of Underwood's claims, which the trial court granted. Underwood appealed.

**Discussion**

In reviewing a grant or denial of summary judgment, "we owe no deference to the trial court's ruling and we review de novo both the evidence and the trial court's legal conclusions." *Mitchell & Assocs., Inc. v. Global Sys. Integration, Inc.*, 356 Ga. App. 200, 200 (844 SE2d 551) (2020) (punctuation omitted). For each issue, the ultimate question is whether, viewing the evidence in the light most favorable to the party opposing summary judgment (here, Underwood), a genuine issue of material fact remains and thus precludes judgment as a matter of law. *Blondell v. Courtney Station 300 LLC*, ___ Ga. App. ___ (Case Nos. A21A0731 et al., decided November 2, 2021).

1. Underwood first contends that the trial court erred in granting summary judgment to Colony on Underwood's breach of contract claim. Underwood argues that Colony, through oral representations and course of conduct, modified the terms of the written forbearance agreement, and that Colony later breached the modified agreement when it announced without warning that it was going ahead with the

7

foreclosure. We agree that an issue of fact exists under which a jury could find that Colony breached the parties' modified, quasi-contractual agreement.

(a) As an initial matter, we must address Colony's contention that the forbearance agreement itself is not an enforceable contract. See *SunTrust Bank v. Bickerstaff*, 349 Ga. App. 794, 799 (824 SE2d 717) (2019) (contract construction and enforceability are questions of law for the court). We conclude that the forbearance agreement is enforceable.

(i) The written forbearance agreement is enforceable. We disagree with Colony's argument on appeal that the agreement is not supported by consideration from Underwood. See OCGA § 13-3-1 ("To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate."). Colony correctly observes that the requirement of consideration is not satisfied by a party's promise to do what he is already obligated to do. See, e.g., *Riverview Condo. Assn. v. Ocwen Fed. Bank, FSB*, 285 Ga. App. 7, 9–10 (2) (b) (645 SE2d 5) (2007); *Llop v. Nat. Bank of Ga.*, 154 Ga. App. 504, 504 (268 SE2d 777) (1980). But Underwood promised in the forbearance agreement to do more than just continue making the payments he already had to make. To avoid foreclosure,

8

Underwood had to pay the ATech note in full, pay $25,000 immediately, and pay an additional $25,000 in each of the next three months, in addition to maintaining current payments on the Underwood note. Those promises were enough consideration to support the forbearance agreement. See *ALR Oglethorpe, LLC v. Fidelity Nat. Title Ins. Co.*, ___ Ga. App. ___ (2) (b) (Case No. A21A0989, decided September 27, 2021) ("slight consideration is sufficient to sustain a contract") (punctuation omitted). Indeed, our case law routinely treats forbearance agreements like the one here as legitimate. See, e.g., *L.D.F. Family Farm, Inc. v. Charterbank*, 326 Ga. App. 361, 362, 365 (1) (756 SE2d 593) (2014); *Ceasar v. Wells Fargo Bank, N.A.*, 332 Ga. App. 529, 532 (2) (744 SE2d 369) (2013); *Sudler v. Campbell*, 250 Ga. App. 537, 540 (1) (550 SE2d 711) (2001).

(ii) We further conclude that the forbearance agreement was effectively modified at the September 3, 2019, meeting between Underwood and Worthy.

The terms of a written contract may be modified by a later oral agreement or by the parties' course of conduct, when such agreement is founded on sufficient consideration. *Hanham v. Access Mgmt. Group L.P.*, 305 Ga. 414, 417 (3) (825 SE2d 217) (2019). And notably, a contract can be modified in this way even if the contract provides—as the forbearance agreement did here—that it cannot be modified except

9

by written agreement. See id. at 417 (3) n.2 ("the parties' subsequent course of conduct can also operate to waive an otherwise validly enforceable written requirement that all modifications be in writing"); *Gerdes v. Russell Rowe Commc'ns, Inc.*, 232 Ga. App. 534, 536 (1) (502 SE2d 352) (1998) ("waiver of a written modification requirement in a contract may be established through the course of conduct between the parties") (punctuation omitted).

When Underwood and Worthy met on September 3, Underwood was in breach of the written forbearance agreement, having failed to make the payment due on August 30. The parties then reached a new agreement. Each of them made additional concessions: Colony gave Underwood a few more days to make the August 30 payment; in exchange, Underwood delivered the deed in lieu. The parties' oral agreement on September 3, supported by consideration, modified the forbearance agreement. *Hanham*, 305 Ga. at 417 (3), n.2.

(b) We turn next to Underwood's contention on appeal, which is that the parties' course of conduct *after* the September 3 meeting modified the forbearance agreement once again. Underwood argues that the forbearance agreement was modified further when Colony accepted late and partial payments through the fall of 2019. Underwood further contends that Colony breached the final version of the

10

agreement by foreclosing on the collateral in February 2020 without giving sufficient notice. We agree with Underwood that Colony's acceptance of late, partial payments creates issues of fact as to whether the forbearance agreement was further modified and, if so, whether Colony provided enough notice that it intended to enforce the exact terms of the agreement. Because these issues of fact should be decided by a jury, the trial court erred in granting summary judgment to Colony on this claim.

(i) The first issue that should have been left to the jury is whether the parties mutually departed from the express terms of the forbearance agreement, as modified at the September 3 meeting.

Georgia law allows parties to mutually depart from the exact terms of a contract. But if they do, they must honor their new understanding. A party who has mutually departed from a contract along with his counterparty cannot then enforce the letter of the contract against the counterparty without providing reasonable notice. The relevant statute provides:

> When parties, in the course of the execution of a contract, depart from its terms and pay or receive money under such departure, before either can recover for failure to pursue the letter of the agreement, reasonable notice must be given to the other of intention to rely on the exact terms of the agreement. The contract will be suspended by the departure until such notice.

11

OCGA § 13-4-4.

As a general rule, it is a jury question whether parties to a contract have mutually departed under OCGA § 13-4-4. *Oklahoma Gaming Ventures, Inc. v. PCT Holdings, LLC*, 340 Ga. App. 120, 122 (796 SE2d 752) (2017) ("[w]hether there has been a mutual departure from the terms of a contract is a question for the fact-finder"). And that general rule has routinely been applied in cases where, as here, a lender repeatedly accepts late, partial payments under a loan agreement. *Banks v. Echols*, 302 Ga. App. 772, 776 (1) (b) (691 SE2d 667) (2010) ("[e]vidence of a debtor's repeated late, irregular payments, which are accepted by the seller, creates a factual dispute as to whether a quasi new agreement was created under OCGA § 13-4-4"); *Wright Carriage Co. v. Business Dev. Corp. of Ga.*, 221 Ga. App. 49, 52 (1) (471 SE2d 218) (1996) (explaining that "evidence of the buyer's repeated, late, irregular payments, which are accepted by the seller, does create a factual dispute as to whether a quasi new agreement was created under OCGA § 13-4-4," and that, "[i]f a pattern develops of the lender repeatedly accepting late payments . . . then a jury is entitled to find the parties have established a course of conduct that varies that term of the agreement") (punctuation omitted); see also *Reynolds v. CB&T*, 342 Ga. App. 866, 870 (1) (805 SE2d 472) (2017) (mutual departure was a question for the jury

where there was evidence showing that a lender agreed to modify or extend due date of loan).

Colony points to cases where we found no mutual departure as a matter of law when a lender (or in some cases an insurer) accepted a few late payments. See, e.g., *Prudential Ins. Co. of Am. v. Nessmith*, 174 Ga. App. 39 (329 SE2d 249) (1985); *Crawford v. First Nat. Bank of Rome*, 137 Ga. App. 294, 296 (223 SE2d 488) (1976). But in those cases, the lender (or insurer) consistently manifested the clear intention to enforce the terms of the written contract and accepted the late payments under those terms. In *Prudential Ins. Co.*, we noted that there was no evidence the insurer solicited or encouraged the late payments. Rather, the insurer assisted the insured in "reinstat[ing]" the policy as written after each late payment, which was necessary because the late payment voided the policy each time. *Prudential Ins. Co.*, 174 Ga. App. at 41. Similarly, in *Crawford*, we reasoned that "[e]vidence that [the borrower] received notices from the Bank advising her that her account was past due, and that the Bank exacted the payment of a late charge when delayed installments were accepted, manifested an intent on the part of the Bank to demand and enforce strict compliance with the terms of the contract." *Crawford*, 137 Ga. App. at 296.

13

Here, the record viewed in the light most favorable to Underwood does not show a similar unambiguous expression by Colony that it intended all along to adhere to the terms of the forbearance agreement. To the contrary, on the three dates on which Underwood was required to make a $25,000 payment and did not make one—September 9, September 30, and October 31 —there is no evidence that Colony communicated with Underwood about immediate payment, exacted a penalty, exercised its default remedies, or in any other way invoked recourse under the forbearance agreement. If anything, Colony telling Underwood "not to worry" about selling his convenience store to satisfy the debt, as Underwood asserts it did, could support a finding that Colony did *not* intend to adhere to the forbearance agreement. So this case is materially distinguishable from *Crawford* and *Prudential Ins. Co.*

To survive summary judgment, Underwood needed only to show there was a fact issue that would allow a jury to find that there was a mutual departure from the terms of the forbearance agreement. See *Banks*, 302 Ga. App. at 776–77 (1) (b). Given the factual record on which Underwood relies—Colony's repeated acceptance of late, partial payments; Colony's failure to make clear that it intended to enforce the written agreement all along; and Colony's telling Underwood "not to worry" about immediate payment after he had fallen behind—the question whether the parties

14

mutually departed from the agreement must remain a question for the jury, as is the general rule.

(ii) The question whether Colony provided enough notice to Underwood before purporting to enforce the terms of the forbearance agreement in February 2020 was also properly a question for the jury. OCGA § 13-4-4 allows parties to return to the exact terms of their agreement after a temporary mutual departure, but it requires that reasonable notice be given to the party against whom the agreement will be enforced. And the reasonableness of such notice is ordinarily a question for the jury. See *Banks*, 302 Ga. App. at 777 (1) (b) ("a jury question has also been presented as to whether Echols provided Banks with reasonable notice of his intent to strictly enforce the agreement terms"); *Williams v. Nat. Auto Sales, Inc.*, 287 Ga. App. 283, 287 (1) (651 SE2d 194) (2007) ("there is evidence on which a jury could find that National's failure to give Williams reasonable notice of its intent to strictly enforce the payment provisions rendered the repossession and subsequent sale unlawful"). The evidence here shows that Colony, through counsel, sent a letter dated February 21, 2020, to Underwood's counsel, informing him that he had five days from the date of the letter to pay the ATech note in full and bring current his payments on the Underwood note. Underwood had five days, at most, to pay $53,800.43. And Underwood asserts that

15

this letter was sent by first class mail and that he did not receive it until after the deadline had passed. Under those facts, a jury could reasonably conclude that Colony did not provide sufficient notice to Underwood under OCGA § 13-4-4. See, e.g., *Williams*, 287 Ga. App. at 287–87 (1); *Banks*, 302 Ga. App. at 776–77 (1) (b).

(iii) Finally, we disagree with Colony's contention that mutual departure is an affirmative defense, and not proper support for a cause of action for breach of contract. It is true that mutual departure often arises as an affirmative defense to a claim of breach of contract, where the defendant asserts he did not breach the contract because the parties mutually departed from its terms. See, e.g., *Niloy & Rohan, LLC v. Sechler*, 335 Ga. App. 507, 511 (2) (782 SE2d 293) (2016) ("Under Georgia law, the doctrine of mutual departure is a defense to a breach of contract action."). But mutual departure can also support an affirmative cause of action for breach of contract when, as here, the plaintiff contends that the defendant breached the parties' new quasi-contract that was established by the mutual departure. See *Reynolds*, 342 Ga. App. at 868–70 (1) (reversing summary judgment in favor of defendant on breach of contract claim where issues of fact remained as to whether parties mutually departed from written promissory notes to create new quasi-contract).

16

2. Underwood contends that the trial court erred in granting summary judgment on Underwood's claim of promissory estoppel. He argues that because Worthy said at the September 3 meeting that Underwood would have "more time to pay," Colony is now estopped from enforcing the terms of the forbearance agreement. We disagree.

To establish a claim for promissory estoppel, Underwood must show that (1) Colony made a promise, (2) Colony should have reasonably expected Underwood to rely on that promise, (3) Underwood did rely on the promise, to his detriment, and (4) an injustice can be avoided only by enforcing the promise, because as a result of Underwood's reliance, he "changed [his] position to [his] detriment by surrendering, forgoing, or rendering a valuable right." *Woodstone Townhouses, LLC v. S. Fiber Worx, LLC*, 358 Ga. App. 516, ___ (4) (855 SE2d 719) (2021). As Underwood is the one asserting a claim of promissory estoppel, he bears the burden of proving all the elements, and "[i]f there is no evidence sufficient to create a genuine issue as to any essential element . . . [then the] claim tumbles like a house of cards." Id. (punctuation omitted).

Underwood's claim fails on the first element, because Worthy's assurance that Underwood would have "more time to pay" was too vague and indefinite to be an enforceable promise. The existence of an enforceable promise is the "threshold

17

requirement" for a claim of promissory estoppel, and promises that are vague, indefinite, or of uncertain duration are not enforceable. *Woodstone Townhouses*, 358 Ga. App. at ___ (4) (a). In a number of cases similar to this one, we have rejected borrowers' claims of promissory estoppel where a lender allegedly made vague statements concerning the borrower's outstanding debt. See, e.g., *Oconee Fed. Sav. & Loan Assn. v. Brown*, 349 Ga. App. 54, 65 (825 SE2d 456) (2019) (no promissory estoppel where lender bank allegedly made nonspecific promises to borrowers about their application to modify the lending agreement); *Griffin v. State Bank of Cochran*, 312 Ga. App. 87, 95–96 (2) (a) (718 SE2d 35) (2011) (no promissory estoppel where lender bank told borrower that it "would continue to renew the Note," where the alleged promise lacked terms and conditions); *Ga. Investments Intl., Inc. v. Branch Banking and Trust Co.*, 305 Ga. App. 673, 675–76 (1) (700 SE2d 662) (2010) (no promissory estoppel where lender discussed allowing borrower to refinance loan but did not specify material terms such as interest rate). Similarly, here, Worthy may have told Underwood that he had "more time to pay," but there was no discussion of how much more time, or which notes the extension related to, or any other material terms. Because Worthy's remark was vague and indefinite, summary judgment was appropriate as to Underwood's promissory estoppel claim.

18

3. Underwood argues the trial court erred in denying his motion to "set aside" the deed in lieu of foreclosure under OCGA § 23-3-3. We disagree.

A request to set aside a deed sounds in equity. See, e. g., *Russell v. Argent Mtg. Co., LLC*, 286 Ga. 60, 61 (684 SE2d 867) (2009) (referring to "the aid of equity to set aside the deed"); *Strickland v. McElreath*, 308 Ga. App. 627, 628–29 (708 SE2d 580) (2011) (action to set aside conveyance of a deed sounded in equity). And "[h]e who would have equity must do equity and must give effect to all equitable rights of the other party respecting the subject matter of the action." OCGA § 23-1-10. Put simply, when a debtor seeks to set aside a foreclosure sale, he must first pay what he owes to the creditor absent extraordinary circumstances. See *Oconee Fed. Sav. and Loan*, 349 Ga. App. at 60–61 (borrowers not entitled to injunction of foreclosure because they did not pay to lender the amount owed under the governing agreement); *Sparra v. Deutsche Bank Natl. Trust Co.*, 336 Ga. App. 418, 420–21 (1) (b) (785 SE2d 78) (2016) (borrower not entitled to injunction halting a foreclosure sale because he did not tender the amount owed on his mortgage); *Hill v. Filsoof*, 274 Ga. App. 474, 475 (1) (618 SE2d 12) (2005) (borrower not entitled to set aside foreclosure sale because he did not tender payment of the debt owed under the note secured by the collateral property). Compare *Metro Atlanta Task Force for the Homeless, Inc. v. Ichthus*

19

*Community Trust*, 298 Ga. 221, 236–37 (4) (a) (780 SE2d 311) (2015) (borrowers' lawsuit alleging wrongful foreclosure was allowed to proceed even though borrowers did not tender payment, where sale of promissory notes constituted tortious interference that harmed borrowers' ability to pay).

Here, it is undisputed that as of February 2021—a year after Colony recorded the deed in lieu—Underwood still had not paid Colony what he owed under the notes. He makes no claim that he has done so since then. He does not point to any extraordinary circumstances that might excuse him from tendering payment. And although he argues on appeal that he told Colony he could sell his convenience store "to pay off all remaining indebtedness," that general remark did not amount to an actual tender of payment. See *Crockett v. Oliver*, 218 Ga. 620, 620–21 (1) (129 SE2d 806) (1963) (borrower's statement that he "'stands ready, able and willing'" to pay balance of loan was not actual tender). So we conclude the trial court correctly dismissed his claim to set aside the deed in lieu.

4. Underwood argues that the trial court erred when it granted summary judgment on his claim of conversion or trover. The claim is based on Colony's being entrusted with the deed in lieu and then filing it to take possession of the property. Because Georgia law does not recognize a claim of conversion or trover to recover

20

real property, see *Kahn v. Britt*, 330 Ga. App. 377, 391 (5) (b) (765 SE2d 446) (2014), we disagree with Underwood and affirm the trial court's dismissal of this claim.

*

In sum, we affirm the trial court's grant of summary judgment in favor of Colony as to Underwood's claims of promissory estoppel, to set aside the deed in lieu, and for conversion or trover. But we reverse the grant of summary judgment as to Underwood's claim of breach of contract.

*Judgment affirmed in part and reversed in part. Rickman, C.J., and Senior Appellate Judge Herbert E. Phipps concur.*